IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Brian T. Baxter and Susan T. Kinniry | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | Trial Ct. No. 2024 No. 02481 |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of Pennsylvania | : | |
| | : | |
| | : | |
| Appeal of: Philadelphia County | : | |
| Board of Elections | : | No. 1305 C.D. 2024 |
| | | |
| Brian T. Baxter and Susan T. Kinniry | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of Pennsylvania | : | |
| | : | |
| | : | |
| Appeal of: Republican National | : | |
| Committee and Republican Party | : | No. 1309 C.D. 2024 |
| of Pennsylvania | : | SUBMITTED:  October 15, 2024 |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE ELLEN CEISLER, Judge
          HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE CEISLER                                    FILED:  October 30, 2024

In these consolidated cross-appeals, we must decide whether a court of common pleas correctly reversed a county board of elections' decision not to count 69 undated and incorrectly dated absentee and mail-in ballots in a special election in

accordance with Sections 1306 and 1306-D of the Pennsylvania Election Code (Election Code),[1] 25 P.S. §§ 3146.6(a) and 3150.16(a) (dating provisions), on the basis that such refusal violates the free and equal elections clause set forth in article I, section 5 of the Pennsylvania Constitution, Pa. Const. art. I, § 5.[2]

The Philadelphia County Board of Elections (County Board or Board), and the Republican National Committee and the Republican Party of Pennsylvania (RNC and RPP) (collectively, Designated Appellants), appeal from the Court of Common Pleas of Philadelphia County's (trial court) September 26, 2024 order that granted Brian T. Baxter and Susan T. Kinniry's (Designated Appellees) Petition for Review in the Nature of a Statutory Appeal (Petition) filed pursuant to Section 1407 of the Election Code, 25 P.S. § 3157,[3] and reversed the County Board's September 21, 2024 decision not to count Designated Appellees' and 67 other registered voters'

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591. Section 1306 was added to the Election Code by the Act of March 6, 1951, P.L. 3, and thereafter amended by the Act of October 31, 2019, P.L. 552, No. 77 (Act 77). Section 1306 relates to voting by absentee electors and provides, in relevant part, that an absentee "elector shall . . . fill out, date and sign the declaration printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. 25 P.S. § 3146.6(a). Section 1306-D was added to the Election Code by Act 77 and includes the same language as Section 1306 with respect to voting by mail-in electors. 25 P.S. § 3150.16(a).

[2] The free and equal elections clause provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5.

[3] Section 1407(a) provides, in relevant part:

(a) Any person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election . . . may appeal therefrom within two days after such order or decision shall have been made, whether then reduced to writing or not, to the court specified in this subsection, setting forth why he feels that an injustice has been done, and praying for such order as will give him relief.

25 P.S. § 3157(a).

undated and incorrectly dated mail ballots[4] in the September 17, 2024 Special Election to fill two seats in the Pennsylvania House of Representatives (House) in the 195th and 201st Legislative Districts in Philadelphia County. In so doing, and relying on the parties' stipulation of the facts and representations made on the record at a hearing held on September 25, 2024, the trial court determined that the refusal to count a mail-in ballot due to a voter's failure to "**date** . . . the declaration printed on" the outer envelope used to return his/her ballot to county election officials, as required by the Election Code's dating provisions, violates the free and equal elections clause set forth in article I, section 5 of the Pennsylvania Constitution. The trial court thus directed the County Board to count Designated Appellees' and the 67 other registered voters' date-disqualified mail ballots to be verified, counted if otherwise valid, and included in the results of the Special Election for the 195th and 201st Legislative Districts.[5]

On appeal, the County Board agrees with the trial court's ruling that the Board erred in not counting the 69 undated and incorrectly dated mail ballots at issue based on the meaningless dating provisions in violation of the free and equal elections clause given the unsettled nature of the case law addressing that issue, and further asserts there are no impediments to us addressing the issue now based on the undisputed facts of these matters. However, the Board confusingly requests that this Court reverse the trial court's September 26, 2024 order. RNC and RPP argue that several procedural issues preclude this Court's review of the constitutional issue.

---

[4] The term "mail ballots" used in this opinion encompasses both absentee and mail-in ballots, unless otherwise indicated.

[5] Designated Appellants also appeal the trial court's order entered on September 28, 2024 (dated September 27, 2024), which granted RNC and RPP's unopposed Petition for Leave to Intervene (Intervention Petition); declared as moot Designated Appellees' and the County Board's Joint Emergency Motion for Reconsideration and Clarification (Joint Emergency Motion); and denied RNC and RPP's Motion to Dismiss Designated Appellees' Petition.

Alternatively, they contend that the law is well settled that the dating provisions are mandatory and enforceable, and not violative of the free and equal elections clause, and that the trial court erred in changing the rules for determining the validity of mail ballots after the Special Election. Designated Appellees request that this Court affirm the trial court's ruling directing that the noncompliant ballots, including theirs, be counted in the Special Election. Upon careful review, we affirm the trial court under the circumstances of this case.

## I. BACKGROUND

Designated Appellees and the County Board[6] stipulated to the operative facts of this matter as garnered at the September 25, 2024 trial court hearing and as set forth in Designated Appellees' Petition filed in the trial court, as follows. *See* 9/25/2024 Hearing Transcript (H.T.) at 4-9, 12-17, 20-21; Original Record (O.R.), Items 1 (Petition (Pet.)) & 12 (9/26/2024 Trial Court Order).

State law in Pennsylvania provides that mail ballots that fail to comply with the dating provisions shall not be counted. *See* O.R., Item 1, Pet. ¶ 3 (citing *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023)); H.T. at 14. However, multiple state and federal courts have determined that the dating provisions are meaningless, as they do not establish voter eligibility, timely ballot receipt, or fraud. *Id.* ¶¶ 39-40.[7] This is illustrated by the fact that a voter whose ballot was timely received could have signed the declaration form only in between the date the county board sent the mail ballot package and the election day deadline, and ballots received after 8:00 p.m. on

---

[6] Counsel for the RNC and RPP also indicated her understanding of the stipulated facts at the hearing. 9/25/2024 Hearing Transcript (H.T.) at 19-22.

[7] Designated Appellees cited *Pennsylvania State Conference of the NAACP v. Schmidt*, 703 F. Supp. 3d 632 (W.D. Pa. 2023), 2023 WL 8091601 (*NAACP I*), *reversed & remanded*, *Pennsylvania State Conference of NAACP Branches v. Secretary*, 97 F.4th 120 (3d Cir. 2024) (*NAACP II*), as support for their assertion that courts have previously found the dating provisions to be meaningless.

election day are not counted regardless of the handwritten date. *Id.* Enforcement of the dating provisions has resulted in the arbitrary and baseless rejection of thousands of timely ballots, resulting in disenfranchisement in violation of the free and equal elections clause. *Id.* ¶¶ 5-6, 8, 37.[8] Notwithstanding the state and federal cases addressing this, the only case to have addressed whether enforcement of the meaningless dating provisions violates the free and equal elections clause found that it did; however, that decision has since been vacated on procedural grounds by the Supreme Court of Pennsylvania. *Id.* ¶¶ 7, 62 (citing *Black Political Empowerment Project v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed Aug. 30, 2024) (*BPEP II*) (en banc),[9] 2024 WL 4002321, *vacated*, 322 A.3d 221 (Pa. 2024) (Pa., No. 68 MAP 2024, order filed Sept. 13, 2024) (*BPEP III*) (per curiam) (vacating for lack of original jurisdiction), *order clarified*, (Pa., No. 68 MAP 2024, order filed Sept. 19, 2024) (*BPEP IV*) (per curiam) (clarifying Supreme Court's September 13, 2024 order)).

As it relates to the instant appeals, Designated Appellees opted to vote by mail in the September 17, 2024 Special Election for the 195th Legislative District in

---

[8] Designated Appellees pointed out that nearly 10,000 voters whose mail ballots were timely received were disenfranchised in the 2022 General Election and thousands more voters were disenfranchised in the 2023 Municipal Election and the 2024 Presidential Primary Election. O.R., Item 1, Pet. ¶¶ 5-6, 35-38 (providing these figures and citing, *inter alia*, Ex. 3, Declaration of Ariel Shapell, ¶ 12, which notes that more than 10,000 mail ballots in the November 2023 Municipal Election and 2024 Presidential Primary Election were marked as cancelled in the Statewide Uniform Registry of Electors (SURE) System due to missing or incorrect handwritten dates). We note that "[t]he SURE system is . . . the statewide database of voter registration maintained by the Department of State and administered by each county." *In re Nom. Pet. of Morrison-Wesley*, 946 A.2d 789, 792 n.4 (Pa. Cmwlth. 2008).

[9] In *Black Political Empowerment Project v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, order filed July 9, 2024, & opinion filed July 18, 2024) (Ceisler, J.) (single-Judge order & opinion) (collectively, *BPEP I*), this Court denied the intervention application of Westmoreland County Commissioner Doug Chew. *BPEP I* is not relevant for purposes of the instant appeals.

5

Philadelphia. O.R., Item 1, Pet., Ex. 1, ¶ 9 (Declaration of Brian T. Baxter (Baxter Decl.)) & Ex. 2, ¶ 9 (Decl. of Susan T. Kinniry (Kinniry Decl.)). Designated Appellees are qualified electors who are registered to vote in Pennsylvania and live in Philadelphia. They validly applied for, received, and timely submitted their mail-in ballots prior to the Special Election on September 17, 2024. They signed the outer envelopes, and while lacking handwritten dates, the outer envelopes do in fact contain the County Board's date stamps of the dates the ballots were received. The Designated Appellees' undated mail-in ballots were set aside and not counted. O.R., Item 1, Pet. ¶¶ 11, 14-18, 20-22, 41-43; H.T. at 8-9, 12. The timeliness and eligibility of the 67 other voters whose mail ballots were rejected on similar grounds is undisputed. H.T. at 5, 12, 21.

On September 9, 2024, the County Board posted a list of mail ballots received ahead of the Special Election that were "administratively determined to be potentially flawed," which stated that such ballots "have the possibility of **NOT** being counted" and provided information about requesting a replacement ballot or casting a provisional ballot. O.R., Item 1, Pet. ¶ 44 & n.14.[10] Designated Appellees' names appeared on the list of defective ballots,[11] but they did not correct the error on their ballots before 8:00 p.m. on the day of the Special Election. Designated Appellee Kinniry additionally attested to the fact that she received an email from the County Board on August 27, 2024, informing her that her vote would not be counted if she did not take additional steps to fix her omission of the date. However, she did

---

[10] *See* https://vote.phila.gov/news/2024/09/09/2024-special-election-unverifiable-identification-undeliverable-and-or-potentially-flawed-ballots/ (last visited Oct. 28, 2024).

[11] *See* O.R., Item 1 (Petition ¶ 44 & n.14) (citing https://vote.phila.gov/media/2024_Special_Election_Deficiency_List.pdf (listing, *inter alia*, Brian T. Baxter and Susan T. Kinniry and indicating "Ballot Status Reason" for each as "NO DATE") (last visited Oct. 28, 2024)).

6

not attempt to fix her mail-in ballot because she read the news about this Court's decision in *BPEP II*, in which this Court held that it is unconstitutional for county boards of elections to reject mail ballots for noncompliance with the Election Code's dating provisions. *Id.*, Ex. 2, Kinniry Decl., ¶¶ 12, 14 & Ex. A (email from County Board). Designated Appellee Baxter, who is 81 years old, attested that his old age and increasing forgetfulness likely contributed to his failure to date his mail-in ballot. *Id.*, Ex. 1 (Baxter Decl.), ¶¶ 2, 11.

Following the September 17, 2024 Special Election, and pursuant to Section 1404(f) of the Election Code, 25 P.S. § 3154(f) (providing for computation of returns by county board, among other things), the County Board met in a public meeting on Saturday, September 21, 2024, to review the mail ballots from the Special Election, 23 of which had been segregated due to missing dates and 46 of which had been segregated for possible incorrect dates. O.R., Item 1, Pet. ¶¶ 24, 45-46, 52 & n.16 (citing County Board Agenda); H.T. at 4-5. Regarding the 23 undated ballots, Philadelphia City Commissioner[12] Sabir moved to not count them, which motion was seconded by Commissioner Bluestein. *Id.* ¶ 46, n.17 (citing link to County Board Meeting livestream). Commissioner Deeley responded by reading an excerpt from this Court's now-vacated opinion and order in *BPEP II*, providing that a strict scrutiny standard of review applies to the dating provisions' restriction on the fundamental right to vote guaranteed by our Constitution and holding that in the absence of any compelling reasons therefor, the refusal to count undated or incorrectly dated but timely mail ballots submitted by otherwise eligible voters because of meaningless and inconsequential paperwork errors violates the fundamental right to vote recognized in the free and equal elections clause. O.R.,

---

[12] The Philadelphia City Commissioners sit as the County Board for the City and County of Philadelphia. *See* H.T. at 4; O.R., Item 1 (Pet. ¶ 23, n.5).

7

Item 1, Pet. ¶¶ 47-48. Commissioner Deeley thus concluded, based on *BPEP II* and the Commissioners' sworn oath to uphold the Pennsylvania Constitution, that not counting the 23 undated mail-in ballots because of meaningless and inconsequential errors would violate the Pennsylvania Constitution. *Id.* ¶¶ 48-49. Although Commissioner Bluestein indicated his apparent concurrence in principle that the 23 ballots should be counted, he noted the Supreme Court's ruling in *BPEP III*, vacating this Court's *BPEP II* decision, and that the Commissioners have an obligation to follow the law as it currently stands, which prohibits the counting of the 23 undated ballots. *Id.* ¶ 50. As for the 46 incorrectly dated ballots, the County Board moved to not count them, and Commissioner Deeley again noted her objection considering this Court's *BPEP II* ruling that the free and equal elections clause requires that the ballots be counted, with which Commissioner Sabir appeared to agree. *Id.* ¶¶ 52-53. Despite that the County Board acknowledged at the September 21 meeting that the dating provisions serve no purpose, it nevertheless voted 2-1 as to each set of defective mail ballots and thereafter orally announced its decision not to count the 69 undated and incorrectly dated mail ballots, including Designated Appellees' undated but timely received mail-in ballots. *Id.* ¶¶ 24 & nn.8-9, 51, 54, 61; H.T. at 5 (stating that all 69 undated and incorrectly dated mail ballots were timely received by the County Board), 6 (noting Exs. 1-2 (Baxter & Kinniry Decls.) are stipulated facts of record), 12-13.

On September 23, 2024, Designated Appellees timely filed their Petition in the trial court, setting forth the above facts and asserting that the County Board's failure to count Designated Appellees' undated mail-in ballots violated their fundamental right to vote under the free and equal elections clause of the Pennsylvania Constitution. Designated Appellees argued that a strict scrutiny

8

standard of review applies to the dating provisions' restriction on that right, under which the party defending the challenged action must prove that it serves a compelling government interest. According to Designated Appellees, the County Board cannot demonstrate a compelling interest that justifies its wholesale disenfranchisement of voters where the handwritten date requirement serves no purpose in determining timeliness of receipt or voter qualifications, which the County Board acknowledged at its September 21 meeting. Designated Appellees thus requested that the trial court issue an order reversing the County Board's decision, declaring that the Pennsylvania Constitution requires the counting of their mail-in ballots, and directing the County Board to count their undated mail-in ballots cast in the September 17, 2024 Special Election. *See* O.R., Item 1, Pet. ¶¶ 55-63 & Wherefore Clause.

The trial court held a hearing on the Petition on September 25, 2024, during which many of the above facts were again relayed by the parties. Designated Appellees' counsel also acknowledged during the hearing that "[t]he number of ballots at issue is not enough to impact the outcome, especially in an unopposed race, or two unopposed races." H.T. at 16-17 (further recognizing "[i]t is impossible" that the at-issue ballots "would be outcome determinative in the [S]pecial [E]lection"), 18. The County Board thus filed a proposed Consent Order of Court (Consent Order) between it and Designated Appellees, which the trial court signed and entered on the docket on September 25, 2024, stating as follows:

1. The [County Board] is authorized to certify the results of the September 17, 2024 Special Election to the Pennsylvania Department of State [(Department)] and to take any and all such other actions necessary to accomplish the same, without impacting the pending litigation; and

9

2. The parties have agreed that if either or both of the [p]etitioners [(i.e., Designated Appellees)] ultimately prevail on the merits, the [County Board] will open and canvass their mail ballots and file an amended vote count with the . . . Department . . . reflecting their votes in the September 17, 2024 Special Election.

O.R., Item 10, Consent Order of Court signed 9/23/2024 & entered 9/25/2024; H.T. at 16-18.

Also during the hearing, RNC and RPP preserved their Intervention Petition filed prior to the hearing, which the trial court indicated it had yet to review; however, the court allowed RNC and RPP to participate in the proceedings and noted their objection to Designated Appellees' Petition. H.T. at 6-7, 19-20; *see* O.R., Item 11, RNC/RPP Intervention Petition. RNC and RPP also filed the proposed Motion to Dismiss Designated Appellees' Petition with their Intervention Petition, and a supporting brief, asserting that the holdings in *In re Canvass of Absentee & Mail-in Ballots*, 241 A.3d 1058 (Pa. 2020) (*In re Canvass 2020*), and *Ball* that the dating provisions are mandatory remain controlling here; that the Supreme Court already rejected a free and equal elections clause challenge to the dating provisions in *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020); that the Supreme Court rejected a request for it to exercise its extraordinary jurisdiction in in *BPEP III*, 322 A.3d at 222; and that, even if Designated Appellees' challenge to the dating provisions' constitutionality is an open question, the clause's plain text and history and controlling federal and other states' precedent foreclose such claim. RNC and RPP also argued that granting the requested relief would distort state law and violate various provisions of the United States and Pennsylvania Constitutions, would result in nonuniformity amongst the county boards in applying the dating provisions and sow chaos amid an ongoing election, and would require invalidation of the entirety of Act 77 under its nonseverability provision. Even if the trial court

10

did consider the issue, they further highlighted that the Supreme Court recently reaffirmed that strict scrutiny does not apply and that mandatory ballot-casting rules only violate the free and equal elections clause if they deny the franchise itself or make it so difficult to vote so as to amount to a denial in *In re Canvass of Provisional Ballots in 2024 Primary Election (Walsh)*, __ A.3d __ (Pa., No. 55 MAP 2024, filed Sept. 13, 2024) (also citing *Winston v. Moore*, 91 A. 520 (Pa. 1914)). Finally, RNC and RPP contended that the Petition is procedurally defective for the same jurisdictional reasons the Supreme Court cited in vacating our *BPEP II* decision.

Based upon the above undisputed facts, the trial court recognized that "a degree of uncertainty" had been created by recent appellate case law, including *Ball* and *BPEP II* and *III*, regarding whether undated and incorrectly dated mail ballots should or should not be counted and observed that "[t]here is no per se controlling law on this conflict issue." H.T. at 9, 14-16. In apparent reliance on our vacated decision in *BPEP II*, the trial court then ruled on the record that Designated Appellees made out a claim under the free and equal elections clause of article I, section 5 of the Pennsylvania Constitution, noting the Constitution "always prevails over a conflict in the statutory language" and that its ruling was based "upon the undeniable and confirmatory position of the parties that this will in no way prejudice the ordinary and efficient process of the [County] Board . . . in processing [its] faithful duty to the Election Code." H.T. at 18, 21-22. The court also reserved ruling on RNC and RPP's Intervention Petition. *Id.* at 21-22.

On September 26, 2024, the trial court issued its order granting Designated Appellees' Petition, reversing the County Board's decision not to count Designated Appellees' undated mail-in ballots and the 67 other registered voters' defective mail ballots because such refusal violates the free and equal elections clause, and

directing the County Board to verify, count if otherwise valid, and include in the results of the Special Election all 69 defective mail ballots. O.R., Item 12, 9/26/2024 Trial Court Order. By separate Rule to Show Cause order issued on September 26, 2024, the trial court directed the parties to respond to RNC and RPP's Intervention Petition. *See* O.R., Item 13, 9/26/2024 Trial Court Rule to Show Cause Order.[13]

On September 27, 2024, Designated Appellees and the County Board filed their Joint Emergency Motion, asserting that RNC and RPP's Intervention Petition was uncontested and seeking clarification on whether the trial court intended its first September 26, 2024 order on the merits of the Petition to be the final order in this case for appeal purposes considering the Supreme Court's August 27, 2024 Order shortening certain election-related appeal deadlines,[14] or whether the trial court intended to conduct further proceedings in light of its second September 26, 2024 Rule to Show Cause order regarding the Intervention Petition. O.R., Item 16, Joint Emergency Motion. The trial court thereafter entered its final order on September 28, 2024 (dated September 27, 2024), granting RNC and RPP's Intervention Petition,[15] declaring moot the parties' Joint Emergency Motion, and denying RNC and RPP's Motion to Dismiss. O.R., Item 17, 9/27/2024 Trial Court Final Order.

---

[13] By September 27, 2024 order, the trial court declared as moot the parties' "Filed Stipulation," as it was duplicative of their Consent Order. *See* O.R., Item 15 (9/27/2024 Trial Court Order).

[14] The Supreme Court's Order was effective as of August 29, 2024. *See In Re Temporary Modification and Suspension of the Rules of Appellate Procedure and Judicial Administration for Appeals Arising Under the Pennsylvania Election Code* (Pa., No. 622 Judicial Admin. Dkt., filed Aug. 27, 2024) (per curiam), slip op. at 3.

[15] The trial court noted that the Intervention Petition was not docketed until the day after the court issued its September 25, 2024 order on the Petition (which is actually dated and entered as of September 26, 2024), and that this delayed the matter and caused inconvenience to the parties in obtaining finality of the court's ruling and necessitated further proceedings to dispose of the Intervention Petition. *See* O.R., Item 17 (9/27/2024 Trial Court Final Order), at 1, n.1.
**(Footnote continued on next page…)**

Designated Appellant County Board thereafter appealed the trial court's September 26, 2024 order on the merits of the Petition and its September 28, 2024 final order to this Court on October 1, 2024, and Designated Appellants RNC and RPP filed their cross-appeal of the same orders on October 3, 2024.[16]

By separate orders entered on October 3, 2024, the trial court directed Designated Appellants to file concise statements of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) within 21 days of the order. O.R., Items 20 & 21. This Court, by Order of October 3, 2024, *sua sponte* consolidated the cross-appeals and directed the filing of Statements of Issues to be Presented on Appeal by October 8, 2024, transmission of the record to this Court by October 10, 2024, and the filing of simultaneous briefs on the merits of the appeals no later than October 15, 2024. The Court also indicated the appeals would be submitted on briefs without oral argument unless otherwise ordered. By Order of October 8, 2024, this Court granted Designated Appellees' partially contested Application for Expedited

---

Although the parties appealed the trial court's September 28, 2024 final order granting RNC and RPP's Intervention Petition, they raise no issues as to RNC and RPP's intervention on appeal. We therefore do not address their intervention further for purposes of these appeals and will affirm the trial court's final order in that regard.

[16] In their Notice of Appeal, RNC and RPP assert various reasons why the Supreme Court's August 27, 2024 Order is inapplicable to this matter. First, they assert that this case involves the September 17, 2024 Special Election in Philadelphia, not the November 5, 2024 General Election. They also claim the underlying Petition sought a declaration that the County Board's decision was unlawful under the Pennsylvania Constitution, not the Election Code; therefore, they concluded a 30-day appeal period for a declaratory judgment matter was appropriate. Finally, RNC and RPP point out that the trial court did not append a copy of the Supreme Court's Order to either its September 26 or September 28 orders. *See* O.R., Item 19.

This Court agrees with RNC and RPP that the Supreme Court's August 27, 2024 Order does not apply to this matter, **which relates to a Special Election that has already occurred, and not the 2024 General Election**. However, given that time is of the essence in any actions that may be required following issuance of this opinion, such as amending the Special Election vote count pursuant to the parties' Consent Order, the Court urges the parties to proceed expeditiously should they wish to appeal this decision.

13

Briefing Schedule, directed the parties to file their briefs on October 14, 2024, instead of October 15, 2024, and indicated the remainder of the Court's October 3, 2024 Order remained in full force and effect. The parties complied with the Court's orders and filed Statements of Issues and briefs as directed.

On October 10, 2024, the trial court issued a 2-page opinion pursuant to Pa.R.A.P. 1925(a),[17] setting forth an abbreviated version of the above facts and procedural history of this matter and noting that "the court's reasons for its decision [on the Petition] were fully stated on the record at the hearing and are reflected in the transcript" and that the court issued an order the next day "memorializing that decision." *See* 10/10/2024 Trial Court "1925a Order" at 1-2. Further, the court rejected the parties' arguments in the Joint Emergency Motion and observed that the order granting Designated Appellees' Petition on the merits "related to a special election that had already occurred and did not involve voting in the November 2024 election[.]" *Id.* at 2, n.1. The court also explained that it denied RNC and RPP's Motion to Dismiss because it was not identified or asserted at the hearing and was not properly filed as a motion in time for the court to consider it, and it was also untimely and procedurally defective. *Id.* at 2.

---

[17] This Court notes that the trial court's October 10, 2024 Pa.R.A.P. 1925(a) opinion is titled, "1925a Order," and that it is replete with typos, making it difficult to read. However, the Court can discern the trial court's reasoning, which appears in the September 25, 2024 hearing transcript and is based primarily on our decision in *BPEP II*.

## II. PARTIES' & *AMICI CURIAE* ARGUMENTS

### A. Parties' Arguments

#### 1. Designated Appellant County Board

Contrary to its statement in its brief that it "takes no position on the issue" of whether the free and equal elections clause prohibits county boards of elections from rejecting mail ballots because of dating errors on the outer declaration envelope, the County Board nevertheless agrees with the trial court that not counting such ballots based on the meaningless dating provisions violates the free and equal elections clause. (County Board Brief (Br.) at 2, 6-7, 13.) It claims this constitutional issue remains unsettled, highlighting the "shifting" federal and relevant state litigation on the issue since 2020, including decisions of our Supreme Court in *In re Canvass 2020* and *Ball*, and our now-vacated decision in *BPEP II*, the "net effect of" which "strongly suggests that the Board would violate voters' constitutional rights if it were to refuse to count mail ballots with dating errors in the 2024 General Election." (*Id.* at 9-12.) Confusingly, however, the County Board seeks reversal of the trial court's September 26, 2024 order to avoid the scenario where the Board is (1) an outlier from other county boards on this issue, and (2) ordered to count mail ballots with dating errors in the Special Election but then is ordered to not count the same defective ballots weeks later in the General Election. (*Id.* at 13.)

It nevertheless urges this Court to address the constitutional issue now, asserting this Court has a statutory and jurisdictional obligation to resolve the issue's merits in the context of these direct statutory election appeals filed under Section 1407(a) of the Election Code, 25 P.S. § 3157(a), and claiming that *Purcell v. Gonzalez*, 549 U.S. 1 (2006), is not a barrier to us doing so. (*Id.* at 14-15 (pointing out that these **appeals** do not involve a preliminary injunction entered without a

15

developed factual record regarding changes to voter identification (ID) laws, as was the case in *Purcell*).) The Board highlights that unlike in *Purcell*, here, there would be no disruption to an imminent election, i.e., the 2024 General Election, as any decision by this Court in these appeals would merely be *"a vote-counting decision and not a change in the rules impacting the voting process or voter behavior."* (*Id.* at 7, 14-15.) Further distinguishing this case from *Purcell*, the Board submits there is no risk of voter confusion or hardship on election administrators for either prior or future elections, because the September 17 Special Election already occurred, and, therefore, the only issue is whether the at-issue mail ballots should be included in final tally for the Special Election, "which is a normal post-election occurrence" contemplated by the Election Code and also our Supreme Court in *New PA Project Education Fund v. Schmidt* (Pa., No. 112 MM 2024, order filed Oct. 5, 2024) (*New PA Project*) (per curiam) (denying the same *BPEP II* petitioners' application for the exercise of King's Bench or extraordinary jurisdiction that sought review of whether disenfranchising voters based on the meaningless dating provisions violates the free and equal elections clause).[18] (*Id.* at 14-18 (further observing that *Purcell* places no constraints on state courts, and that the Supreme Court stated in *New PA Project* it would continue to exercise its appellate jurisdiction with respect to lower court decisions that have already come before it in the normal course).)

The County Board also points out that the facts here are straightforward and undisputed and that it does not use the handwritten date to determine a voter's qualifications or timeliness of ballots, or to detect fraud. Rather, the Board adds that it uses an automated sorting machine to recognize envelopes that fail to include handwritten signatures or secrecy envelopes but assesses handwritten dates

---

[18] Three minority statements were issued, which we summarize below.

manually, which is time-consuming. (*Id.* at 19-21.) Finally, the Board argues that resolution of this appeal also will not require invalidation of any part of Act 77, and even if it does, the Court has discretion on whether to apply Act 77's nonseverability provision. (*Id.* at 7-8, 21-24 (citing *Bonner v. Chapman*, 298 A.3d 153, 168-69 (Pa. Cmwlth. 2023), in which this Court decided Act 77's nonseverability provision was not triggered because the decision not to enforce the dating provisions did not strike those provisions from the statute, and asserting that, in any event, *Stilp v. Commonwealth*, 905 A.2d 918 (Pa. 2006), is on point as to nonseverability).)

### 2. Designated Appellants RNC & RPP

For their part, Designated Appellants RNC and RPP disagree with the County Board's position, arguing that several procedural defects require reversal of the trial court's order, namely that (1) Designated Appellees committed the same error as in *BPEP II* by failing to name the other 66 purportedly indispensable county boards in their Petition filed in the trial court; (2) additional factual development regarding the dating provisions is necessary; and (3) the trial court erred in retroactively changing election rules for the Special Election in violation of *Purcell* and without any factual development, regular briefing, or setting forth any reasoning in an opinion. (RNC & RPP's Br. at 53-56.) If the procedural defects are determined to be nonissues, RNC and RPP submit that *Purcell*'s holding, allegedly confirmed by our Supreme Court's citation thereto in *New PA Project*, forecloses invalidation of the dating provisions in these appeals during the ongoing 2024 General Election. (*Id.* at 10-12.) As to the merits of the constitutional and nonseverability issues, RNC and RPP largely repeat the same arguments in their brief to this Court as in their Motion to Dismiss filed in the trial court, which we do not repeat here for the sake of brevity.

17

(*See supra* pp. 10-11; *see also* RNC & RPP's Br. at 10-53.) They request that the trial court's order be reversed.

### 3. Designated Appellees Baxter & Kinniry

Designated Appellees respond to RNC and RPP's procedural arguments, largely agreeing with the County Board's assertions that there are no impediments to our review of these election appeals in our appellate jurisdiction. They specifically assert that the timing of the 2024 General Election does not compel reversal of the trial court's order, as *Purcell* does not apply here because it is a federal law equitable doctrine grounded in federalism and is specific to federal courts, not state courts; they thus disagree with RNC and RPP that *New PA Project* constitutes a sea change on this point. (Designated Appellees' Br. at 45-48.) They also suggest that application of a *Purcell*-type principle is out of place in the context of an appeal under Section 1407 of the Election Code, which actions can only arise when "county boards are in the throes of an election" given the time constraints attendant thereto in that section. (*Id.* at 47-48.) Designated Appellees further claim that the other 66 county boards need not have been named in this action, because these are appeals authorized by Section 1407 of the Election Code regarding the Special Election held in Philadelphia County only, and none of those county boards sought to intervene. (*Id.* at 23, 51-60.)

As to the merits of the constitutional issue, Designated Appellees repeat their arguments from their Petition, which we also do not repeat here for the sake of brevity. (*See supra* p. 9; *see also* O.R., Item 1 & Designated Appellees' Br. at 24-57.) All in all, they assert that "the Constitution . . . compels the same result on the merits" as our now-vacated decision in *BPEP II*. (Designated Appellees' Br. at 1, 31.) They finally assert that the relief they sought in the trial court does not implicate

18

Act 77's severability clause or the federal Elections Clause of the United States Constitution,[19] and they request that we affirm the trial court's order. (*Id.* at 53-60.)

**B.**     ***Amici Curiae* Arguments**

The Department of State and the Secretary of the Commonwealth, Al Schmidt (collectively, Secretary), filed an *amicus* brief in support of Designated Appellees,[20] adding that, while he agrees with the Supreme Court's statement in *New PA Project* that it will not change election rules at this late stage of the game, the Supreme Court will nevertheless be confronted with this issue at some point specifically in relation to the 2024 General Election. (Sec'y's Br. at 8-9.)[21] **The Secretary submits that resolving the constitutional issue now would not be disruptive or affect voters in any way, but rather, it would make county boards' responsibilities easier on election day. The Secretary suggests that this case is an opportune one for resolving the question left open by the Supreme Court in *BPEP III*, and he requests that we affirm.** (*Id.* at 11-12.)

Thirty-four county board of elections' officials (*Amici* BOE Officials) filed a joint brief as *amici curiae*, similarly agreeing with Designated Appellees, and the County Board to an extent, and arguing that this Court's holding in *BPEP II* was correct on the merits. (*Amici* BOE Officials' Br. at 2-3.) They highlight this is especially so now given that nearly 70 "highly motivated electors in a low turnout Philadelphia special election" were disenfranchised by enforcement of the dating

---

[19] U.S. Const. art. I, § 4, cl.1.

[20] The Secretary attached, as Exhibit A, his brief filed in *BPEP II*.

[21] The Secretary cites *Zimmerman v. Schmidt* (Pa. Cmwlth., No. 33 M.D. 2024, filed Aug. 23, 2024) (en banc), *vacated & remanded*, __ A.3d __ (Pa., No. 63 MAP 2024, order filed Sept. 25, 2024) (per curiam), in which the Supreme Court vacated our decision for lack of jurisdiction similar to its order in *BPEP III*, and remanded for this Court to dismiss the suit with prejudice, noting that it is better to address election-related questions before such a decision becomes outcome determinative. The merits of *Zimmerman* are otherwise not relevant for our purposes.

provisions.  (*Id.* at 3, 6-7.)  *Amici* BOE Officials add that, in their experience, such disenfranchisement will likely affect thousands of voters in the upcoming General Election and disproportionately affect older electors, like Designated Appellee Baxter in this case.  (*Id.* at 3, 8-15.)  They further claim, among other things, that the dating provisions divert *Amici* BOE Officials away from other pressing election administration duties.  (*Id.* at 3-4, 15-19.)  *Amici* BOE Officials depart from the County Board's position here by requesting that we affirm the trial court.

The Republican Leader of the Pennsylvania House of Representatives, Bryan Cutler; President Pro Tempore of the Pennsylvania State Senate, Kim Ward; and Majority Leader of the Pennsylvania Senate, Joe Pittman (collectively, *Amici* Republican Leaders), filed an *amici curiae* brief in support of RNC and RPP, essentially repeating the same arguments on the merits and in favor of reversal. *Amici* Republican Leaders add only that, in the alternative, this Court should remand for further proceedings to develop the record with complete advocacy and a legally sufficient Pa.R.A.P. 1925(a) opinion, which they claim is, at present, lacking.  (*Amici* Republican Leaders' Br. at 4-8.)

## III.  DISCUSSION

Before reaching the merits of the free and equal elections clause issue, we first address our jurisdiction over these election appeals.  The parties do not dispute that this Court has subject matter jurisdiction over the appeals under Section 762(a)(4)(i)(C) of the Judicial Code, 42 Pa.C.S. § 762(a)(4)(i)(C),[22] or that the

---

[22] In *Dayhoff v. Weaver*, 808 A.2d 1002, 1004-06 (Pa. Cmwlth. 2002), we considered an appeal from a court of common pleas' order that upheld a determination of a county board of elections, albeit with respect to two candidates who tied in an election for township supervisor.  In addressing whether we or our Supreme Court had jurisdiction over the appeal, we acknowledged that Section 1407 of the Election Code, 25 P.S. § 3157, under which the instant Petition was filed in the trial court, does not provide for an appeal to this Court from a court of common pleas.  *Id.* **(Footnote continued on next page…)**

manner in which the appeals were brought was proper under Section 1407(a) of the Election Code, 25 P.S. § 3157(a). They instead disagree about whether *Purcell* forecloses, or even applies to, this Court's consideration of the constitutional issue of first impression presented by these appeals during the ongoing 2024 General Election, even though the appeals relate to the September 17 Special Election.

In *Purcell*, the United States (U.S.) Supreme Court considered a challenge of the State of Arizona and county officials from four counties to an interlocutory injunction issued by a two-judge motions panel of the United States Court of Appeals for the Ninth Circuit that enjoined operation of Arizona's voter ID requirements without any explanation or justification mere weeks before the 2006 general election. *Purcell*, 549 U.S. at 2-3. Noting that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls" and that "[a]s an election draws closer, that risk will increase[,]" as one of the possible reasons why the Ninth Circuit may have taken prompt action without providing any explanation therefor, the U.S. Supreme Court found those considerations, and others, were not controlling and that the Ninth Circuit erred in not giving deference to the District Court's denial of the injunction as a procedural matter. *Id.* at 4-5. The U.S. Supreme Court therefore vacated the Ninth Circuit's order, citing "the necessity for clear guidance to the State of Arizona" **given the impending election** and the inadequate time to address any factual issues in the case. *Id.* at 5-6.

---

at 1005. However, we observed that Section 762(a)(4)(i)(C) of the Judicial Code, 42 Pa.C.S. § 762(a)(4)(i)(C), does "provide[] expressly that the Commonwealth Court shall have **exclusive** jurisdiction over appeals from the trial courts in cases involving elections or election procedures." *Id.* at 1006 (emphasis in original). This is such a case over which we have exclusive appellate jurisdiction.

We do not believe that the U.S. Supreme Court's vacatur of an Arizona federal court's interlocutory injunction halting implementation of an entire voter ID scheme established by proposition **mere weeks before a general election** is comparable to these cross-appeals involving a court of common pleas' reversal of a Pennsylvania county board's decision to reject mail ballots for failure to comply with our state Election Code's dating provisions at the expense of disenfranchising voters in violation of our Constitution **in a special election that has already occurred**. While the considerations specific to general elections expressed in *Purcell* may ring true in Pennsylvania in other contexts, such as in our Supreme Court's recent order in *New PA Project*,[23] we do not find that those statements foreclose our ability to decide the constitutional issue of first impression presented by these appeals, filed in our **exclusive appellate** jurisdiction, relating to whether certain votes should be counted **in that special election**.[24] *See* 42 Pa.C.S. § 762(a)(4)(i)(C). We highlight

---

[23] We also reject RNC and RPP's assertion that the Supreme Court's citation to *Purcell* in *New PA Project*, in a footnote, was a wholesale adoption of "the *Purcell* principle" as it relates to Pennsylvania **special** elections, particularly ones that have already happened. *New PA Project* involved a request by the same *BPEP II* petitioners filed against the 67 county boards of elections, which asked our Supreme Court to exercise its King's Bench authority to decide whether disenfranchising voters based on the Election Code's meaningless dating provisions violates the free and equal elections clause. Notably, the petitioners' request in *New PA Project* was made in relation to the 2024 General Election, **and not as to the September 17, 2024 Special Election, which has already occurred**. We believe this distinguishes *New PA Project* from this case. Our conclusion in this regard is bolstered by our Supreme Court's recognition in *New PA Project* that it would still exercise its appellate role with respect to lower court decisions that already came before it in the ordinary course. *See New PA Project*, slip op. at 3, n.2 (citing *Genser v. Butler Cnty. Bd. of Elections* (Pa., Nos. 26 & 27 WAP 2024), and *Ctr. for Coalfield Justice v. Wash. Cnty. Bd. of Elections* (Pa., No. 28 WAP 2024)). This case too may reach the Supreme Court in the ordinary course. The Supreme Court has since decided *Genser*. *See Genser* (Pa., Nos. 26 & 27 WAP 2024, filed Oct. 23, 2024).

[24] This Court has previously observed that "a special election is separate and apart from a primary" or general election, and that "special election[] votes are considered separate and apart from any other votes cast as part of any other election." *In re Nom. Papers of Adams*, 648 A.2d **(Footnote continued on next page…)**

that we must decide only whether the trial court erred in reversing the County Board's decision not to count the 69 date-disqualified mail ballots and directing that those ballots be counted; we are **not** being asked to make changes with respect to the impending 2024 General Election. *Purcell* is therefore distinguishable, and under Section 1407(a) of the Election Code and Section 762(a)(4)(i)(C) of the Judicial Code, Designated Appellants were entitled to appeal the trial court's order reversing the County Board's decision to this Court.[25] We therefore hold that we may decide the constitutional issue of first impression properly preserved and presented to us in our exclusive appellate jurisdiction.

Turning to the merits, we first observe that these appeals involve the important constitutional principle enshrined in the free and equal elections clause of article I, section 5 of the Pennsylvania Constitution that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5. Our Supreme Court has recognized that "[t]he broad text of this specific provision mandates clearly and unambiguously, and in the broadest possible terms, that **all** elections conducted in this Commonwealth must be free and equal. Stated another way, this clause was specifically intended to equalize the power of voters in our Commonwealth's election process." *Pa. Democratic Party*, 238 A.3d at 356 (quoting *League of Women Voters v. Cmwlth.*, 178 A.3d 737, 804, 812 (Pa. 2018) (emphasis in original)

---

1350, 1352 (Pa. Cmwlth. 1994) (citing Section 102(v) of the Election Code, 25 P.S. § 2702(v) (defining "special election" as "any election other than a regular general, municipal or primary election"), and *Munce v. O'Hara*, 16 A.2d 532, 533 (Pa. 1940)).

[25] On this same basis, we also reject any contention that the other 66 county boards of elections needed to be joined as parties for Designated Appellees to obtain the relief they sought from the trial court pertaining to the September 17, 2024 Special Election, which **only took place in one county of this Commonwealth, Philadelphia County**. The requested relief could not have been sought against any other county board in relation to that Special Election.

(brackets & internal quotes omitted)). Additionally, the Supreme Court has "observed that the purpose and objective of the Election Code, which contains Act 77, is '[t]o obtain freedom of choice, a fair election[,] and an honest election return[.]'" *Id.* (quoting *Perles v. Hoffman*, 213 A.2d 781, 783 (Pa. 1965)). We have also stated that "the purpose of the Election Code is to protect, not defeat, a citizen's vote." *Dayhoff v. Weaver*, 808 A.2d 1002, 1006 (Pa. Cmwlth. 2002) (internal quotations omitted).

In considering election-related matters generally, including where the fundamental right to vote is at stake, "we are mindful of the 'longstanding and overriding policy in this Commonwealth to protect the elective franchise.'" *Pa. Democratic Party*, 238 A.3d at 360-61 (quoting *Shambach v. Bickhart*, 845 A.2d 793, 798 (Pa. 2004)). "'[O]ur goal must be to enfranchise and not to disenfranchise [the electorate].'" *Id.* (quoting *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972)). Our Supreme Court has indeed recognized that "[t]he disfranchisement of even one person validly exercising his right to vote is **an extremely serious matter**." *Perles v. Cnty. Return Bd. of Northumberland Cnty.*, 202 A.2d 538, 540 (Pa. 1964) (emphasis added).

Our Supreme Court has further cautioned that the power to reject ballots based on minor irregularities "must be exercised **very sparingly** and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election **except for compelling reasons**." *Appeal of Gallagher*, 41 A.2d 630, 632-33 (Pa. 1945) (emphasis added) (also observing that "[m]arking a ballot in voting is a matter not of precision engineering but of unmistakable registration of the voter's will in substantial conformity to statutory requirements"). Further, **"[e]very rationalization within the realm of common sense should aim at saving [a] ballot**

**rather than voiding it[,]"** *Appeal of Norwood*, 116 A.2d 552, 554-55 (Pa. 1955) (emphasis added), and, therefore, "[t]echnicalities should not be used to make the right of the voter insecure[,]" *Appeal of James*, 105 A.2d 64, 65-66 (Pa. 1954) (further providing that "[w]here the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage"). Considering these overarching principles and bearing in mind our limited standard of review,[26] we turn to the merits of the parties' arguments.

At issue is whether the trial court correctly reversed the County Board's decision not to count 69 undated and incorrectly dated mail ballots in the September 17, 2024 Special Election in accordance with the Election Code's meaningless dating provisions on the basis that the failure to count those ballots violates the free and equal elections clause of article I, section 5 of the Pennsylvania Constitution. The parties' arguments as to this issue all hinge to some extent on this Court's opinion and order in *BPEP II*, in which we considered the same free and equal elections clause claim as a matter of first impression in our original jurisdiction.

---

[26] This Court's review "in election contest cases is limited to [an] examination of the record to determine whether the trial court committed errors of law and whether the [trial court's] findings [a]re supported by adequate evidence." *Dayhoff*, 808 A.2d at 1005 n.4. In reviewing questions of law, our standard of review is *de novo*. *In re Benkoski*, 943 A.2d 212, 215 n.2 (Pa. 2007).

25

However, as the parties point out in their briefs, our Supreme Court vacated our *BPEP II* order in *BPEP III*,[27, 28] relied solely on jurisdictional grounds in doing so,

<hr/>

[27] On September 13, 2024, the Supreme Court vacated our *BPEP II* order on jurisdictional grounds in *BPEP III*, concluding that we lacked subject matter jurisdiction to consider the matter in the absence of all 67 county boards being named as parties, and because the Secretary's joinder was not sufficient to invoke our original jurisdiction. *BPEP III*, 322 A.3d at 222 (further denying the request for extraordinary jurisdiction). Justice Wecht filed a dissenting statement, in which Chief Justice Todd and Justice Donohue joined, offering his view that "[a] prompt and definitive ruling on the constitutional question presented in th[e] appeal is of paramount public importance inasmuch as it will affect the counting of ballots in the upcoming general election." *BPEP III*, 322 A.3d at 222-23 (Wecht, J., dissenting). Justice Wecht also expressed that he would have exercised the Court's King Bench authority over the dispute and ordered that the matter be submitted on briefs. *Id.* at 223. Thus, at least three Supreme Court Justices appeared to agree with this Court, at least as to the public import of the same constitutional question involved in the instant appeals.

Six days later, on September 19, 2024, the Supreme Court granted the intervenor/appellants' Emergency Application for Enforcement and/or Clarification and clarified its September 13 Order in *BPEP III*, explaining that the Secretary was not an indispensable party, and that the other named county boards did not vest this Court with original jurisdiction. *BPEP IV*, slip op. at 1-2. The Court further clarified it vacated our order for an additional independent jurisdictional reason, i.e., the failure of the petition for review to join all indispensable parties—the other 65 county boards of elections. *BPEP IV*, slip op. at 2. Because this jurisdictional defect could not be remedied, the Court directed that we dismiss the matter upon remand, which we did by Order of September 20, 2024. *Id.*, slip op. at 2-3.

[28] As noted above, in *New PA Project*, the Supreme Court rejected a third attempt to have the constitutional issue heard under its King's Bench authority before the 2024 General Election. In its Order denying the petitioners' requested relief, the Supreme Court stated that it "will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election." *New PA Project*, slip op. at 3. The Court's order also cited *Purcell*, which we have already determined is not a bar to our consideration of the constitutional issue in the context of these appeals involving the Special Election. *Id.*, slip op. at 3, nn. 1-2.

Justice Brobson filed a concurring statement, in which Justice Mundy joined, opining that laches also warranted denial of the application, in that the petitioners waited over a year after *Ball* was issued and after multiple elections had been held to challenge the dating provisions, as interpreted to be mandatory in *Ball*, under the free and equal elections clause. *New PA Project*, slip op. at 3-4 (Brobson, J., concurring). He further observed that the Court's disposition of the application in *New PA Project* "should discourage all who look to the courts of the Commonwealth to change the rules in the middle of an ongoing election." *New PA Project*, slip op. at 5 (Brobson, J., concurring). He expressed a similar sentiment in another election case decided the same day, *Republican National Committee v. Schmidt* (Pa., 108 MM 2024, order filed Oct. 5, 2024) (*RNC*) **(Footnote continued on next page…)**

26

and did not consider the merits or disapprove of our reasoning on the merits of the constitutional claim. We do not believe the Supreme Court's order precludes our analysis of that issue now in these appeals relating to the Special Election. The record reveals that our reasoning in *BPEP II* was central to the trial court's reasoning in reversing the County Board's decision not to count the 69 mail ballots at issue, and we see no reason to depart from that reasoning here. *See* N.T. at 3-22; *see also* 10/10/2024 Trial Court "1925a Order" at 1-2.

The trial court found that the legal landscape that exists after *BPEP II* and *III* is uncertain, and the parties agree this essentially puts us back to square one on the merits of this important constitutional question that has arisen during our primary, general, and now **special** elections in this Commonwealth since 2020, when Act 77 went into effect. The question is one of first impression, and the parties have not identified any cases in which any court has considered this issue aside from *BPEP II*. We are left to interpret the law in this area as it existed before we issued our decision in *BPEP II*, beginning with the plain text of the dating provisions.

The dating provisions provide that absentee and mail-in electors "shall . . . fill out, **date** and sign the declaration printed on" the second, or outer, envelope "on

---

(per curiam), observing that deciding an issue regarding notice and cure issues "would . . . be highly disruptive to county election administration" given that the 2024 General Election is already underway. *RNC*, slip op. at 2 (Brobson, J., concurring).

Chief Justice Todd filed a dissenting statement in *New PA Project*, setting forth her opinion that the Court should exercise its King's Bench power and decide the issue of "grave importance" now, citing the possibility of disenfranchisement and potential post-election challenges related to the same. In Chief Justice Todd's view, both *Ball* and *BPEP II* and *III* "amply demonstrate continued uncertainty in this area of the law." *New PA Project*, slip op. at 3-4, n.2, 5 (Todd, C.J., dissenting). Justice Donohue issued a statement in support of denial, noting her view that the Court is not "standing on firm terrain" in the legal landscape surrounding the constitutional issue, consideration of which she characterized as "serious business," and observing that "[t]ime will tell if there is a future challenge, in the ordinary course, in a court of common pleas." *New PA Project*, slip op. at 3-4 (Donohue, J., statement in support of denial).

which is printed the form of the declaration of the elector," among other things. *See* 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added). Designated Appellants RNC and RPP argue that the Supreme Court's decisions in *In re Canvass 2020*, *Pennsylvania Democratic Party*, and *Ball* require reversal of the trial court's order. We briefly address those cases before reaching the constitutional claim.

In *In re Canvass 2020*, 241 A.3d 1058, which involved five consolidated appeals, our Supreme Court addressed, in the context of the November 2020 General Election, whether the Election Code required county boards to disqualify mail ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, address, and/or the date, where no fraud or irregularity was alleged. *See id.* at 1061-62. The Court concluded that the Election Code did not require that county boards disqualify signed but undated mail ballot declarations, **reading the dating provisions' language as directory rather than mandatory.** *Id.* at 1076-77, 1079 (**noting the Court found that such defects, "while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters" and that "[h]aving found no compelling reasons to do so, we decline to intercede in the counting of the votes at issue in these appeals**" (emphasis added)). However, a majority of the Justices in *In re Canvass 2020* ultimately agreed that the failure to comply with the dating provisions would render noncompliant ballots invalid in any election after 2020. *See Ball*, 289 A.3d at 21-22 (reaffirming *In re Canvass 2020*'s majority's holding in this regard as a matter of statutory interpretation). As such, *In re Canvass 2020* is not helpful for our purposes.

In *Pennsylvania Democratic Party*, 238 A.3d 345, which notably was issued mere weeks before a hotly contested Presidential election and amid the novel

28

COVID-19 pandemic, our Supreme Court did not consider **any** issue regarding the Election Code's dating provisions specifically, let alone under the free and equal elections clause. Rather, *Pennsylvania Democratic Party* involved notice and opportunity cure procedures, which are **not** at issue in these appeals. RNC and RPP's reliance on this case is thus without merit.[29]

Most recently for our purposes, in *Ball*, 289 A.3d 1,[30] a majority of our Supreme Court weighed in on the interpretation of the dating provisions, recognizing

---

[29] Designated Appellants RNC and RPP rely on this case for the proposition that the Supreme Court already rejected a challenge to the broader mail ballot declaration requirements, only one part of which is the dating provisions, under the free and equal elections clause. They point to the Supreme Court's consideration of whether the Constitution's free and equal elections clause required that county boards implement notice and opportunity to cure procedures for mail ballots containing minor defects, which is just one of the discrete issues that was before the Court in that case. *See Pa. Democratic Party*, 238 A.3d at 372-74. We reject these interpretations.

[30] For background purposes, we note that in *Ball*, the Supreme Court issued a per curiam Order on November 1, 2022, granting in part and denying in part the petitioners' request for injunctive and declaratory relief and ordering Pennsylvania county boards of elections to refrain from counting any absentee and mail-in ballots received for the November 8, 2022 General Election that were contained in undated or incorrectly dated outer envelopes; further noting the Court was evenly divided on the issue of whether failing to count such ballots violates 52 U.S.C. § 10101(a)(2)(B) (i.e., the federal Materiality Provision); further directing the county boards to segregate and preserve any ballots contained in undated or incorrectly dated outer envelopes; and dismissing the individual voter petitioners from the case for lack of standing. The Court noted that opinions would follow, and that Chief Justice Todd and Justices Donohue and Wecht would find a violation of federal law, while Justices Dougherty, Mundy, and Brobson would find no violation of federal law. *See Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022) (per curiam).

On November 5, 2022, the Supreme Court issued a supplemental Order, clarifying that for purposes of the November 8, 2022 General Election, "incorrectly dated outer envelopes" are as follows: (1) mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022, through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022 (citing Sections 1302.1-D (added by Act 77), 1305-D (added by Act 77), 1302.1 (added by the Act of August 13, 1963, P.L. 707, and amended by Act 77), and 1305 (added by the Act of March 6, 1951, P.L. 3, and amended by Act 77), 25 P.S. §§ 3150.12a, 3150.15, 3146.2a(a), 3146.5(a)). *See Ball v. Chapman* (Pa., No. 102 MM 2022, suppl. order issued Nov. 5, 2022) (per curiam). Notably, this Order was issued by the Court **unanimously**.
**(Footnote continued on next page…)**

that "an undeniable majority [of that Court] already ha[d] determined that the Election Code's command is unambiguous and mandatory, and that undated ballots would **not** be counted in the wake of *In re* [] *Canvass* [*2020*]." *Ball*, 289 A.3d at 21-22 (noting that "[f]our Justices [in *In re Canvass 2020*] agreed that failure to comply with the date requirement would render a ballot invalid in any election after 2020") (emphasis in original). The *Ball* Court therefore reaffirmed the *In re Canvass 2020* majority's conclusion as a matter of statutory interpretation of the Election Code. *Id.* at 22. As for incorrectly dated mail ballots, which *In re Canvass* did not address, the Court rejected other state and federal courts' interpretation[31] that any date is "sufficient," reasoning that "[i]mplicit in the Election Code's textual command . . . is the understanding that the 'date' refers to the day upon which an elector signs the declaration." *Id.* The Court determined, however, that how county boards verify the date an elector provides is the day upon which he or she completed the declaration was, "in truth," a question beyond its purview. *Id.* at 23. Further, having issued guidance for the November 8, 2022 General Election in its November 5, 2022 supplemental Order,[32] the Court observed that "county boards of elections retain authority to evaluate the ballots that they receive in future elections—including those that fall within the date ranges derived from statutes indicating when it is possible to

---

On February 23, 2023, the Court issued numerous opinions explaining the Court's rationale and/or agreement or disagreement with the Court's prior orders. *See Ball*, 289 A.3d 1.

[31] *See Chapman v. Berks Cnty. Bd. of Elections* (Pa. Cmwlth., No. 355 M.D. 2022, filed Aug. 19, 2022) (Cohn Jubelirer, P.J.) (single-Judge op.), 2022 WL 4100998, at *18 (observing that the dating provisions say "date" but that the statute "does not specify which date"); and *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir.) (observing that the county board of elections "counted ballots with obviously incorrect dates"), *vacated as moot*, 143 S. Ct. 297 (2022).

[32] It also clarified that its November 5, 2022 supplemental Order was intended to provide guidance and uniformity for the November 8, 2022 General Election, and that the date ranges included therein "were intended to capture the broadest discernible period of time within which an elector could have an absentee or mail-in ballot in hand, and thus could become able to 'fill out, date and sign' the declaration on the return envelope." *Ball*, 289 A.3d at 23.

30

send out mail-in and absentee ballots—for compliance with the Election Code." *Id.* This was the extent of the Supreme Court's interpretation of the dating provisions under state law in *Ball*.

With respect to whether the dating provisions violated the federal Materiality Provision, as to which the *Ball* Court was evenly divided[33] and regarding which it did not issue any order, we note, in relevant part, the Supreme Court's finding that "invalidating ballots received in return envelopes that do not comply with the [dating provisions] denies an individual the right of 'having such ballot counted and included in the appropriate totals of votes cast,' and therefore [] 'den[ies] the right of an individual to vote in any election.'" *Ball*, 289 A.3d at 25 (citing federal Materiality Provision). Further, recognizing that the interpretive rule against superfluities (i.e., that a statute should be read together so effect is given to all of its provisions and so none are rendered inoperative or superfluous) counseled against a reading of the Materiality Provision as including, in the term "voting,"[34] **all** steps involved in casting a ballot, which would render the Materiality Provision's term "other act requisite to voting" without meaning, the Court opined, as follows, in footnote 156:

> In the event that Congress' meaning in the phrase "other act requisite to voting" might be deemed ambiguous, we would reach the same result. In such a circumstance, **failure to comply with the [dating provisions] would not compel the discarding of votes in light of the**

---

[33] Three Supreme Court Justices at the time joined Part III(C) of *Ball* regarding the Materiality Provision, including Justice Wecht, Chief Justice Todd, and Justice Donohue.

[34] For context, we note the Materiality Provision provides, in relevant part, that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to **voting**, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *See* 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

31

> **[f]ree and [e]qual [e]llections [c]lause, and our attendant jurisprudence that ambiguities are resolved in a way that will enfranchise, rather than disenfranchise, the electors of this Commonwealth.** *See* Pa. Const. art. I, § 5; [*Pa. Democratic Party*], 238 A.3d at 361.

*Ball*, 289 A.3d at 26-27, n.156 (emphasis added).

The precise issues that were before the Court in *Ball* were whether **the Election Code** required disqualification of undated and incorrectly dated absentee and mail-in ballots and whether failing to count mail ballots that do not comply with the dating provisions would violate the federal Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B). Notably, the *Ball* Court did not decide the precise question raised in these appeals of whether the dating provisions' enforcement to reject undated and incorrectly dated but timely received absentee and mail-in ballots violates the free and equal elections clause. Nevertheless, the *Ball* Court recognized, albeit with respect to the federal Materiality Provision, that a free and equal elections clause challenge to the dating provisions may someday arise notwithstanding their unambiguous and mandatory command. We therefore reject RNC and RPP's contention that *Ball* settled the free and equal elections clause issue for purposes of these appeals.

Turning to the constitutional claim regarding the dating provisions, Designated Appellees argue that the failure to count their undated mail-in ballots in the Special Election violates the free and equal elections clause, and that the trial court was correct in so ruling. In considering this issue, we begin with the well-established principle that "'acts passed by the General Assembly are strongly presumed to be constitutional.'" *Cmwlth. v. Neiman*, 84 A.3d 603, 611 (Pa. 2013) (quoting *Pa. State Ass'n of Jury Comm'rs v. Cmwlth.*, 64 A.3d 611, 618 (Pa. 2013)). The Court is cognizant that "[t]he judiciary should act with restraint, in the election

32

arena, subordinate to express statutory directives. Subject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair and efficient administration of public elections in Pennsylvania." *In re Clymer*, __ A.3d __ (Pa. Cmwlth., No. 376 M.D. 2024, filed Aug. 23, 2024) (three-Judge panel op.) (citing *Green Party of Pa. v. Dep't of State Bureau of Comm'ns, Elections & Legislation*, 168 A.3d 123, 130 (Pa. 2017) (quoting *In re Guzzardi*, 99 A.3d 381, 386 (Pa. 2014))), slip op. at 24-25. However, **"[w]hile deference is generally due the legislature, we are mindful that the judiciary may not abdicate its responsibility to ensure that government functions within the bounds of constitutional prescription under the guise of its deference to a coequal branch of government**." *Mixon v. Cmwlth.*, 759 A.2d 442, 447 (Pa. Cmwlth. 2000) (emphasis added).

The free and equal elections clause is at the heart of these appeals, which provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5; *Applewhite v. Cmwlth.*, 54 A.3d 1, 3 (Pa. 2012); *see also League of Women Voters*, 178 A.3d at 803. Our Supreme Court has observed that

> [t]he broad text of the first clause of this provision mandates clearly and unambiguously, and in the broadest possible terms, that **all** elections conducted in this Commonwealth must be "free and equal." In accordance with the plain and expansive sweep of the words "free and equal," we view them as indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government. Thus, [a]rticle I, [s]ection 5 guarantees our citizens an equal right, on par with every other citizen, to elect their representatives. Stated another way,

33

the actual and plain language of [s]ection 5 mandates that all voters have an equal opportunity to translate their votes into representation.

*Id.* at 804 (emphasis in original). Furthermore, in recognizing that it "has infrequently relied on this provision to strike down acts of the legislature pertaining to the conduct of elections, the qualifications of voters to participate therein, or the creation of electoral districts, [the Supreme Court noted its] view as to what constraints [a]rticle I, [s]ection 5 places on the legislature in these areas has been consistent over the years." *League of Women Voters*, 178 A.3d at 809.

In describing such constraints, the Supreme Court first cited *Patterson v. Barlow*, 60 Pa. 54, 75 (1869),[35] for the proposition that "while our Constitution gives to the General Assembly the power to promulgate laws governing elections, those enactments are nonetheless subject to the requirements of the [f]ree and [e]qual [e]lections clause . . . , and hence may be invalidated by our Court 'in a case of plain, palpable[,] and clear abuse of the power which actually infringes the rights of the electors'"; therefore, "any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters will violate the guarantee of 'free and equal' elections afforded by [a]rticle I, [s]ection 5."[36] *League of Women Voters*, 178 A.3d at 809-10 (quoting *Patterson*, 60 Pa. at 75).

Next, citing its decision in *Winston*, 91 A. 520, which involved an unsuccessful challenge under the free and equal elections clause to an act of the

---

[35] *Patterson v. Barlow*, 60 Pa. 54, 74-75 (1869), involved a challenge to an act of the legislature that established eligibility qualifications for electors to vote in all elections held in Philadelphia, and it specified the manner in which those elections were to be conducted.

[36] *League of Women Voters*, 178 A.3d 737, involved a constitutional challenge to Pennsylvania's 2011 congressional redistricting plan. The Court's holding is not particularly relevant for purposes of these appeals.

34

legislature that set standards regulating the nominations and elections for judges and elective offices in the City of Philadelphia, the Supreme Court noted it nevertheless prescribed in that case that elections shall be "free and equal" within the meaning of the Constitution

> when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; **when the regulation of the right to exercise the franchise does not deny the franchise itself,** or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*League of Women Voters*, 178 A.3d at 810 (quoting *Winston*, 91 A. at 523 (emphasis added)); *see also Banfield*, 922 A.2d 36, 48 (Pa. Cmwlth. 2007) (citing same standard).

It is undisputed that the fundamental right to vote guaranteed by our Constitution is at issue in these appeals. *Banfield v. Cortés*, 110 A.3d 155, 176 (Pa. 2015) (observing that "the right to vote is fundamental and 'pervasive of other basic civil and political rights'") (citing *Bergdoll v. Kane*, 731 A.2d 1261, 1269 (Pa. 1999)); *In re Nader*, 858 A.2d 1167, 1181 (Pa. 2004) (holding that, "where the fundamental right to vote is at issue, a strong state interest must be demonstrated"). However, the parties disagree about the applicable level of judicial review to be applied to the dating provisions' restriction on that right.[37]

---

[37] RNC and RPP claim that our Supreme Court recently reaffirmed that strict scrutiny does not apply and that mandatory ballot-casting rules only violate the free and equal elections clause if they deny the franchise itself or make it so difficult to vote so as to amount to a denial in *Walsh*. The *Walsh* Court held, *inter alia*, that a provisional ballot should not be counted because the envelope was unsigned, relying on the unambiguous language of the Election Code provision providing that such unsigned provisional ballot shall not be counted. It also rejected a free and equal elections clause challenge because the county board made no showing that a voter having to **(Footnote continued on next page…)**

Because it is instructive, we return to *Pennsylvania Democratic Party*, in which our Supreme Court set forth the proper standards to be considered in evaluating whether state election regulations violate the Constitution. *See Pa. Democratic Party*, 238 A.3d at 384-85:

> In analyzing whether a state election law violates the constitution, courts must first examine the extent to which a challenged regulation burdens one's constitutional rights. *Burdick v. Takushi*, 504 U.S. 428, 434 . . . (1992). Upon determining the extent to which rights are burdened, courts can then apply the appropriate level of scrutiny needed to examine the propriety of the regulation. *See id.* (indicating that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment[, U.S. Const. amends. I, XVI,] rights").
>
> **Where a state election regulation imposes a "severe" burden on a plaintiff's right to vote, strict scrutiny applies and requires that the regulation is "narrowly drawn to advance a state interest of compelling importance."** *Id.* When a state election law imposes only "reasonable, nondiscriminatory restrictions," upon the constitutional rights of voters, an intermediate level of scrutiny applies, and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *See* [*i*]*d.* (upholding Hawaii's ban on write-in voting in the primary where doing so places a minimal burden on one's voting right and supports the state's interest in supporting its ballot access scheme). Where, however, the law does not regulate a suspect classification (race, alienage, or national origin) or burden a fundamental constitutional right, **such as the right to vote,** the state need only provide a rational basis for its imposition. *See Donatelli* [*v. Mitchell*], 2 F.3d [508,] 510 & 515 [(3d Cir. 1993)].

---

sign the outer envelope of a provisional ballot denied the franchise or made it so difficult so as to amount to a denial. *Walsh* is readily distinguishable because, among other reasons, it involved provisional ballots, which are not at issue here. We therefore reject RNC and RPP's argument in that regard.

(Emphasis added.)[38]

Here, Designated Appellees argue that the dating provisions' restriction on their fundamental right to vote violates our Constitution, such that the restriction must be evaluated under strict scrutiny. We agree and conclude that the dating provisions impose a significant burden on Designated Appellees' constitutional right to vote, in that those provisions restrict the right to have one's vote counted in the Special Election to only those voters who **correctly** handwrite the date on their mail ballots and effectively deny the right to all other qualified electors who sought to exercise the franchise by mail in a timely manner but made minor mistakes or omissions regarding the handwritten date on their mail ballots' declarations. Accordingly, we hold that strict scrutiny applies to the dating provisions' restriction on that fundamental right, such that the government bears the heavy burden of proving that the law in question is "narrowly drawn to advance a state interest of compelling importance." *Pa. Democratic Party*, 238 A.3d at 385.

We also agree with Designated Appellees that the dating provisions cannot survive strict scrutiny, as they serve no compelling government interest. As the undisputed factual findings underlying the trial court's order illustrate, thousands of Pennsylvania voters have been disenfranchised by the County Board's rejection of their mail ballots due to missing or incorrect dates on their ballot envelopes, including Designated Appellees and the 67 other qualified voters who were disenfranchised as recently as September 21, 2024, the date the County Board voted

---

[38] *See also In re Clymer*, __ A.3d __ (Pa. Cmwlth., No. 376 M.D. 2024, filed Aug. 23, 2024) (three-Judge panel op.) (setting forth the same standards), slip op. at 24-28; *Appeal of Norwood*, 116 A.2d at 555; *Petition of Berg*, 712 A.2d 340, 341-42 (Pa. Cmwlth. 1998) (setting forth the same standards); *Applewhite v. Cmwlth.* (Pa. Cmwlth., No. 330 M.D. 2012, filed Jan. 17, 2014) (McGinley, J.) (single-Judge op.), 2014 WL 184988, at *20-21 (analyzing former voter ID law under strict scrutiny).

not to count their ballots in the September 17, 2024 Special Election. *See* O.R., Item 1, Pet., ¶¶ 5-6, 35-36 & Ex. 3, 37-40. The trial court also found that the date on the outer mail ballot envelopes is not used to determine the timeliness of a ballot, a voter's qualifications/eligibility to vote, or fraud. *Id.* ¶ 39. We further observe the trial court's findings that all 69 mail ballots at issue were timely submitted to the County Board by 8:00 p.m. on the day of the Special Election and timestamped with the date and time they were so received. *See* O.R., Item 1, Pet. ¶¶ 11, 14-18, 20-22, 41-43 & Exs. 1-2 (Baxter & Kinniry Decls.); H.T. at 5, 8-9, 12, 21. It is apparent that the trial court determined, as we did in *BPEP II* under similar factual circumstances, that the dating provisions are virtually meaningless and, thus, serve no compelling government interest.

We cannot countenance **any** law governing elections, determined to be mandatory or otherwise, that has the practical effect in its application of impermissibly infringing on certain individuals' fundamental right to vote, **which is "pervasive of other basic civil and political rights,"** relative to that of other voters who may be able to exercise the franchise more easily in light of the free and equal elections clause's prescription guaranteeing all citizens an equal right on par with every other citizen to elect their representatives. *See League of Women Voters*, 178 A.3d at 809-10; *Banfield*, 110 A.3d at 176 (emphasis added); *Patterson*, 60 Pa. at 75. To look at a mail ballot that substantially follows the requirements of the Election Code, save for including a handwritten date on the outer envelope declaration, **and which also includes a timestamped date indicating its timely receipt by the voter's respective county board of elections by 8:00 p.m. on Election Day**, and say that such voter is not entitled to vote for whomever candidates he or she has chosen therein due to a minor irregularity thereon "is to negate the

whole genius of our electoral machinery." *Appeal of James*, 105 A.2d at 66. Simply put, the "practical" regulation of requiring voters to date their mail ballot declarations "obstructs and hampers the independent voter" and places voters on unequal playing fields where voters timely submit their mail ballots, but one voter may inadvertently include an "incorrect" date, or a birthdate, or forgets to include the date altogether, and another may include the date on which they filled out the declaration. *Oughton v. Black*, 61 A. 346, 349 (Pa. 1905) (Dean, J., dissenting). Other voters' ballots may not be counted for unknown reasons.

While this Court is fully cognizant that the General Assembly is the entity tasked with effectuating "free and equal" elections vis-à-vis reasonable regulations directing the manner and method of voting, "when the effect of a restriction or a regulation is to debar a large section of intelli[gent] voters from exercising their choice, the Constitution is certainly violated in spirit, if not in letter." *See Oughton*, 61 A. at 349-50 (Dean, J., dissenting); *see also Ball*, 289 A.3d at 25; *In re Canvass 2020*, 241 A.3d at 1076-77, 1079.

Because the refusal to count the 69 undated and incorrectly dated but timely received mail ballots submitted by otherwise eligible voters in the Special Election because of meaningless dating errors violates the fundamental right to vote recognized in and guaranteed by the free and equal elections clause of the Pennsylvania Constitution, we hold that the trial court, faced with the above undisputed facts, did not err in reversing the County Board's decision not to count those ballots and directing the County Board to count them in the September 17, 2024 Special Election.

As a final matter, we address whether our holding triggers Act 77's nonseverability provision, which the trial court did not address. Act 77's

39

nonseverability provision is found in Section 11 of the Act, which provides, in relevant part: "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act **or its application to any person or circumstance is held invalid**, the remaining provisions or applications of this act are void."[39] (Emphasis added.) In *Stilp*, 905 A.2d at 970, our Supreme Court recognized that Section 1925 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1925,[40] established a presumption of severability applicable to all statutes which "is not merely boilerplate" and "does not mandate severance in all instances, but only in those circumstances where a statute can stand alone absent the invalid provision." It also "sets forth a specific, cogent standard, one which both emphasizes the logical and essential interrelationship of the void and valid provisions, and also recognizes the essential role of the Judiciary in undertaking the required analysis." *Id.* Furthermore, because severability "has its roots in a jurisprudential doctrine . . . , the courts have not treated legislative declarations that a statute is severable, or nonseverable, as 'inexorable commands,' but rather have viewed such statements as providing a rule of construction." *Id.* at 972. Considering the substantive standard in Section 1925 of the Statutory Construction Act and the above principles, and the fact we are not asked in these

---

[39] For our purposes, we are concerned only with Sections 6 and 8 of Section 11 of Act 77, which comprise the dating provisions.

[40] It provides: "The provisions of every statute shall be severable. **If any provision of any statute or the application thereof to** any person **or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby**, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." 1 Pa.C.S. § 1925 (emphasis added).

appeals to declare the dating provisions unconstitutional or otherwise strike them from Act 77, we decline to treat Act 77's nonseverability as an "inexorable command" requiring that the entirety of Act 77 be declared void. Rather, we find that the other provisions of Act 77, which enacted a comprehensive scheme of no-excuse mail-in voting that has since been upheld in full as a constitutional exercise of our General Assembly's legislative authority to create universal mail-in voting[41] will not be affected by our ultimate conclusion regarding the unconstitutional **application** of the dating provisions to the 69 voters **in the Special Election**.[42] For these reasons, we find in our judicial discretion that the nonseverability clause is ineffective, and, accordingly, we will not enforce it under the circumstances of this case. *See Stilp*, 905 A.2d at 977-81 (holding that nearly identical nonseverability provision was "ineffective and cannot be permitted to dictate [the Court's] analysis" and that "enforcement of the clause would intrude upon the independence of the Judiciary and impair the judicial function").

## IV. CONCLUSION

These appeals have placed us in the position of having to decide a constitutional issue of first impression regarding whether the application of certain provisions of our Election Code, held to be unambiguous and mandatory but found to be otherwise meaningless, violates the free and equal elections clause of our

---

[41] *See McLinko v. Department of State*, 279 A.3d 539, 582 (Pa. 2022).

[42] *See Stilp*, 905 A.2d at 973; *see also Pa. Fed'n of Teachers v. Sch. Dist. of Phila.*, 484 A.2d 751, 754 (Pa. 1984). We observe that nothing in the otherwise valid provisions of Act 77 is "so essentially and inseparably connected with" the dating provisions, nor can we say that the remaining valid provisions of Act 77, "standing alone, are incomplete [or] are incapable of being executed in accordance with the legislative intent" of that Act. *See* 1 Pa.C.S. § 1925. We therefore see no reason to interfere with this comprehensive scheme enacted and amended multiple times by our Legislature since its inception in 2019, which allows voters of this Commonwealth to confidently vote from the comfort of their own homes.

41

Constitution. Under the circumstances of these appeals, and for the reasons stated above, we hold that the trial court did not err in ordering the County Board to count the 69 undated and incorrectly dated absentee and mail-in ballots cast in the September 17, 2024 Special Election for the 195th and 201st Legislative Districts on the basis that not counting those ballots violates the free and equal elections clause of the Pennsylvania Constitution. *See In re Canvass 2020*, 241 A.3d at 1076-77, 1079 (finding that defects in form of undated mail ballots, "while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement . . . of Pennsylvania voters" and that "[h]aving found no compelling reasons to do so," it **"decline[d] to intercede in the counting of the votes at issue in th[o]se appeals"** (emphasis added)). We also conclude that our narrow holding does not trigger Act 77's nonseverability provision.

Accordingly, we affirm.

ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Brian T. Baxter and Susan T. Kinniry | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | Trial Ct. No. 2024 No. 02481 |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of Pennsylvania | : | |
| | : | |
| | : | |
| Appeal of: Philadelphia County | : | |
| Board of Elections | : | No. 1305 C.D. 2024 |
| | | |
| Brian T. Baxter and Susan T. Kinniry | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of Pennsylvania | : | |
| | : | |
| Appeal of: Republican National | : | |
| Committee and Republican Party | : | No. 1309 C.D. 2024 |
| of Pennsylvania | : | |

# **O R D E R**

AND NOW, this 30th day of October, 2024, the Court of Common Pleas of Philadelphia County's (trial court) September 26 and September 28, 2024 orders are **AFFIRMED**. The Philadelphia County Board of Elections is **ORDERED** to count the undated mail-in ballots cast by Designated Appellees Brian T. Baxter and Susan T. Kinniry, and the absentee and mail-in ballots cast by the other 67 qualified electors whose ballots were rejected due to outer envelope dating errors, in the September 17, 2024 Special Election in the 195th and 201st Legislative Districts in

Philadelphia County, and take any other steps necessary in accordance with the parties' Consent Order of Court entered by the trial court on September 25, 2024.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| Brian T. Baxter and Susan T. Kinniry | : | **CASES CONSOLIDATED** |
|---|---|---|
| | : | |
| v. | : | Trial Ct. No. 2024 No. 02481 |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of | : | |
| Pennsylvania | : | |
| | : | |
| Appeal of: Philadelphia County | : | |
| Board of Elections | : | No. 1305 C.D. 2024 |
| | | |
| Brian T. Baxter and Susan T. Kinniry | : | |
| | : | |
| v. | : | |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of Pennsylvania | : | |
| | : | |
| Appeal of: Republican National | : | |
| Committee and Republican Party | : | No. 1309 C.D. 2024 |
| of Pennsylvania | : | Submitted: October 15, 2024 |

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE ELLEN CEISLER, Judge
HONORABLE MATTHEW S. WOLF, Judge

## *OPINION NOT REPORTED*

DISSENTING OPINION
BY JUDGE McCULLOUGH                                        FILED: October 30, 2024

This Court once again has unnecessarily hurried to change the mail-in voting rules in Pennsylvania, this time mere days before the consummation of a hotly

contested general election.  The ballots at issue in this appeal were cast in an *uncontested* special election in Philadelphia County, and, although important in their own right, those ballots could not and will not change the outcome.  Nevertheless, the Court of Common Pleas of Philadelphia County (trial court), and now this Court, have accepted the invitation of Brian T. Baxter and Susan T. Kinniry (Designated Appellees) to vitiate as unconstitutional the enforceability of the requirements in Sections 1306 and 1306-D of the Pennsylvania Election Code (Election Code)[1] that mail voters date the declarations on the envelopes enclosing their ballots (Declaration Dating Provisions).  There simply was and is no reason to decide this question now, and the Majority certainly has not done so in ordinary course.  Both the trial court and this Court should have declined to issue rushed and novel constitutional rulings that surely will confuse the expectations of both voters and county boards of elections alike.  The rulings could and should have waited.

Further, and even to the extent that we could[2] or should rule on the merits of this appeal now, the Majority's decision suffers fatally from the same errors

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.  Section 1306 was added to the Election Code by the Act of March 6, 1951, P.L. 3, and was amended by the Act of October 31, 2019, P.L. 552, No. 77 (Act 77).  Section 1306 applies to votes cast by absentee electors and pertinently requires that they fill out, sign, and date the declaration on the outer envelope enclosing their ballots.  25 P.S. § 3146.6(a).  Section 1306-D was added to the Election Code by Act 77 and includes the same language as Section 1306 with respect to votes cast by mail-in electors.  25 P.S. § 3150.16(a).  For ease of discussion, I refer herein to both absentee and mail-in voting as "mail" voting.

[2] I agree with Judge Wolf's conclusion in his dissenting opinion that the Majority did not adequately address the question of whether this Court should have transferred this appeal directly to the Supreme Court for consideration pursuant to Section 722(7) of the Judicial Code, 42 Pa. C.S. § 722(7).  Section 722(7) provides, in pertinent part, that the Supreme Court shall have exclusive jurisdiction over any "matters where the court of common pleas has held invalid as repugnant to the . . . [c]onstitution of this Commonwealth . . . any provision of . . . any statute of[] this Commonwealth[.]"  *Id.*  Here, although the trial court's order directs the counting of the
**(Footnote continued on next page…)**

that beset the now-vacated majority decision in *Black Political Empowerment Project v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed August 30, 2024) (*BPEP II*), *vacated*, 322 A.3d 221 (Pa. 2024). I discussed at length in my dissenting opinion in *BPEP II*, and reiterate again here, that the Majority devises out of whole cloth a strict scrutiny standard that it wields to preclude the enforcement of generic, universally applicable ballot-casting requirements that do not "disenfranchise" any voters or burden or affect their "right" to vote to any degree.

Wrong decisions issued at the wrong time are doubly threatening to the integrity of Pennsylvania's elections and the public's confidence in them. Because the Majority here countenances, nay, orders, a substantial change to voting rules at the eleventh hour and on specious grounds, I must respectfully dissent.

## I. The Majority Changes the Rules For the Upcoming General Election.

Designated Appellants Republican National Committee and Republican Party of Pennsylvania argue, and I agree, that the Pennsylvania Supreme Court only a few weeks ago ruled that it would "neither impose nor countenance substantial alternations to existing laws and procedures during the pendency of an ongoing election." *New PA Project Education Fund, NAACP v. Schmidt* (Pa., No. 112 MM 2024, filed October 5, 2024), slip op. at 1. Citing to both *Purcell v.*

---

contested mail ballots on the ground that to do otherwise would violate the free and equal elections clause, the trial court did not invalidate the Declaration Dating Provisions on their face. The Supreme Court nevertheless appears to have accepted jurisdiction under Section 722(7) to address as-applied constitutional rulings, *see, e.g.*, *Department of Transportation, Bureau of Driver Licensing v. Hettich*, 669 A.2d 323 (Pa. 1995), and I agree with Judge Wolf that a strong argument can be made that transfer was appropriate here. Nevertheless, given the thin record, the curt analysis below, and no express holding from the trial court as to the Provisions' validity, I leave the ultimate question of this Court's jurisdiction to our Supreme Court for a final determination. In the event that the Supreme Court determines that we do have jurisdiction, I proceed below to analyze the issues in this case.

*Gonzalez*, 549 U.S. 1, 4-5 (2006), and *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016), the High Court relied on the *Purcell*[3] principle, laches, and/or common sense (an increasingly scarce quality in our election law jurisprudence) to deny an application asking the Court to exercise King's Bench or extraordinary jurisdiction to invalidate under the free and equal elections clause[4] the enforceability of the same

---

[3] *Purcell* involved an Arizona election law that arguably discriminated against some voters because it required proof of citizenship to cast an in-person ballot on election day. Voting rights groups challenged the law, seeking to enjoin its implementation two years after it was approved but only months before the next election. They brought suit in federal district court, which summarily denied the motion. 549 U.S. at 2-3. On appeal, a two-judge motions panel of the Ninth Circuit Court of Appeals granted an injunction pending appeal, which had the effect of reversing the decision below and precluding enforcement of the law. In a *per curium* opinion, the United States Supreme Court vacated the Ninth Circuit's order just days before the 2006 election, once again restoring the status quo. *Id.* at *6*. In vacating the Ninth Circuit's order, the Supreme Court stated:

> Faced with an application to enjoin operation of voter identification procedures just weeks before an election, the Court of Appeals was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures. Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase. So the Court of Appeals may have deemed this consideration to be grounds for prompt action. Furthermore, it might have given some weight to the possibility that the nonprevailing parties would want to seek *en banc* review. . . . These considerations, however, cannot be controlling here. It was still necessary, as a procedural matter, for the Court of Appeals to give deference to the discretion of the District Court. We find no indication that it did so, and we conclude this was error.

*Id.* at 5. Finally, the Court concluded that, "[g]iven the imminence of the election and the inadequate time to resolve the factual issues, our action today shall of necessity allow the election to proceed without an injunction suspending the voter identification rules." *Id.* at 5-6.

[4] "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5.

Declaration Dating Provisions at issue in both *BPEP II* and this case. *New PA Project*, slip op. at 1. Quite obviously, then, the Court determined that precluding as unconstitutional the enforceability of the Declaration Dating Provisions was a substantial change to the election rules that it would neither make itself nor permit in the lower courts. It went on to note that it would nevertheless "continue to exercise [its] appellate role with respect to lower court decisions that *have already come before this Court in the ordinary course*," referencing the appeals it already had granted in *Genser v. Butler County Board of Elections*, ___ A.3d ___ (Pa., No. 26 & 27 WAP 2024, filed October 24, 2024), and *Center for Coalfield Justice v. Washington County Board of Elections* (Pa., No. 28 WAP 2024) (emphasis added).

Justice Donohue concurred, noting that both *Genser* and *Center for Coalfield Justice* were pending in that Court and could impact the determination of whether enforcement of the Declaration Dating Provisions violates the free and equal elections clause. *Id.* (Donohue, J., concurring), slip op. at 3-4. She further noted that "[t]ime will tell if there is a future challenge, *in the ordinary course*, in a court of common pleas." (emphasis added). *Id.*, slip op. at 4. Justice Brobson also concurred, stressing that the petitioners in *New PA Project* had delayed challenging the Declaration Dating Provisions until the last minute, which precluded the development of a record on the question. They accordingly were barred by the equitable doctrine of laches from seeking the exercise of King's Bench jurisdiction. *New PA Project* (Brobson, J., concurring), slip op. at 3-4. *See also id.*, slip op. at 5 ("This Court's disposition of the King's Bench applications in this matter and in [*Republican National Committee v. Schmidt* (Pa., No. 108 MM 2024, filed October 5, 2024),] should discourage all who look to the courts of the Commonwealth to change the rules in the middle of an ongoing election.").

PAM - 5

The Supreme Court's pronouncements straightforwardly apply in this case to preclude the Majority's hasty ruling. The Majority today affords the exact relief that the Supreme Court refused to consider or afford in *New PA Project* precisely because it changes the rules in the middle of a general election. Not only does the Majority's decision change how election boards will count mail ballots with undated or misdated declarations, but it also changes the voting rules after thousands, if not millions, of mail ballots already have been completed and cast by Pennsylvania voters. Many, if not all, counties have procedures in place to notify mail voters if their declarations are undated or misdated and afford them the ability to either request a new mail ballot or vote by provisional ballot. *See Genser*; *Center for Coalfield Justice v. Washington County Board of Elections* (Pa. Cmwlth., No. 1172 C.D. 2024, filed September 24, 2023). What happens to the ballots already cast with undated or misdated declarations? Are they now valid? What do county boards of elections do with replacement mail ballots that have been cast with corrected or filled-in declaration dates? Are the replacement ballots counted, are the original, defective ballots counted, or both? And what about the voters who, due to the defects in the declarations on their mail ballots, have now elected to go to their polling place on election day and cast a provisional ballot, which they now unquestionably may do under the Election Code. *See Genser*. May they do that? Must they do that? Will their prior, defective ballots now be counted?

The Majority fails to consider or sidesteps entirely all of these questions and summarily concludes that *New PA Project* and the *Purcell* do not apply in this case because this case comes to us in our appellate jurisdiction and concerns ballots cast in a now-completed and uncontested special election. But that precisely is the point. The ballots at issue in this appeal, whether or not counted, cannot change the

outcome of the special election. We could rule on these issues next month, next year, or in five years, and the outcome for the special election would be the same in each instance. The ***only*** reason that either the trial court or the Majority would rule on this question now ***is precisely to change the rules for the already underway general election.*** The Majority at best fails to consider the weight of the principles underlying *New PA Project* and *Purcell*, and at worst refuses to comply with a clear and unequivocal directive of our Supreme Court.

Finally, the Supreme Court's recent decision in *Genser* does not compel a different conclusion. The Supreme Court in *New PA Project* identified *Genser* as one of two cases that "already had come before [that] Court in ordinary course." *New PA Project*, slip op. at 1 n.2. *Genser* involved the question of whether voters whose defective mail ballots are received but not counted by a county board of elections may still go to their polling place on election day and cast a provisional ballot. The majority in *Genser*, interpreting the pertinent provisions of Sections 1210 and 1306-D of the Election Code, 25 P.S. §§ 3050, 3150.16, concluded that they may. *See Genser*, ___ A.3d at ___ , slip op. at 44-45. The Court in *Genser* did not change any voting rules or strike any provisions from the Election Code, but, rather, interpreted and enforced them consistently with its prior precedents (and with what appears to be standard practice in most, if not all, counties in the Commonwealth).[5]

---

[5] Notably, the Supreme Court in *Genser* reiterated that defective mail ballots, including those with undated or misdated declarations, must not be counted because the failure to follow the rules for mail voting nullifies the mail ballot. ___ A.3d at ___ , slip op. at 33 & n.29, 44 (citing, in part, *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) (*Pennsylvania Democratic Party*)).

In sum, given the timing of this appeal and the Supreme Court's clear directive in *New PA Project*, I would vacate the trial court's order and remand for the development of an adequate record and the issuance of a new decision with adequate reasoning after the completion of the 2024 General Election.

## II. Enforcement of the Declaration Dating Provisions does not violate the free and equal elections clause.

On the merits, the Majority labors under the same errors that were present in *BPEP II*. First, and although this point ultimately is irrelevant to the proper analysis of a free and equal elections clause challenge, it is far from undisputed here that the Declaration Dating Provisions serve no purpose. The Majority references other court decisions and the stipulated facts below to assume throughout its opinion that the dating provisions are "meaningless." *See Baxter v. Philadelphia Board of Elections* (Pa. Cmwlth., Nos. 1305 & 1309 C.D. 2024, filed October 30, 2024) (MO), slip op. at 4-5. But chanting that word over and over again does not make it reality. Only the operative facts as set forth in the affidavits of Designated Appellees were stipulated in the trial court. *See* Notes of Testimony (N.T.), 9/25/24, at 5-6. Contrary to what the Majority seems to assume, many of the allegations in Designated Appellees' petition for review in the trial court remain disputed, including the purpose of the Declaration Dating Provisions. The record from the trial court is scant, and the Majority's tacit assumption throughout its opinion that the General Assembly wrote meaningless provisions into the Election Code is unwarranted and forced. *See also BPEP II*, slip op. at 32-35 (McCullough J., dissenting).

Second, the Majority here once again concludes that the Declaration Dating Provisions create two classes of voters—those who comply with the Provisions and those who do not. The Majority then concludes that not counting

ballots accompanied by misdated and undated declarations disenfranchises those voters and significantly burdens their right to vote, all in violation of the free and equal elections clause. (MO, slip op. at 35-39.) The Majority accomplishes this by applying "strict scrutiny," a standard typically reserved for challenges to laws that either apply differently to different classes of people or restrict or eliminate altogether the *exercise* of a fundamental right. To such challenges, the Pennsylvania Supreme Court applied such scrutiny in *Pennsylvania Democratic Party*. 238 A.3d at 380, 384-85. It did not, however, apply strict scrutiny or anything like it to the free and equal elections clause challenges that were before it. *Id.* at 372-74.

As I illustrated at length in my dissent in *BPEP II*, the Pennsylvania Supreme Court does not apply and has never applied strict scrutiny in these kinds of cases where facially nonburdensome and neutral ballot-casting rules result in the disqualification of non-compliant ballots. *See BPEP II*, slip op. at 41-48 (McCullough, J., dissenting). The reason for this is patent: if I cast a mail ballot and fail or refuse to follow the rules for doing so, I have not been "disenfranchised" because my *right to vote* remains unaffected, unabridged, and intact. *See Disenfranchise*, Black's Law Dictionary (12th ed. 2024) (defining "disenfranchise" as "depriv[ing] (someone) of a right, esp[ecially] the right to vote; to prevent (a person or group of people) from having the right to vote"). Instead, my *ballot* is disqualified because I did not follow the rules. *Genser*; *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023); *Pennsylvania Democratic Party*. That is not disenfranchisement; that is the rule of law.

Just weeks ago, in *In re Canvass of Provisional Ballots in the 2024 Primary Election*, 322 A.3d 900 (Pa. 2024) (*Walsh*), Justice Mundy, writing for our Supreme Court, reaffirmed that strict scrutiny does not apply to free and equal

elections clause challenges to neutral, universally-applicable ballot-casting rules. In *Walsh*, the Court considered, *inter alia*, whether the Luzerne County Board of Elections should be required to count a provisional ballot cast by a voter who did not sign the outer ballot envelope as Section 1210 of the Election Code requires. The board contended that, under the free and equal elections clause, the electoral process must be kept open and unrestricted to the greatest degree possible and that voting regulations are constitutionally suspect if they "deny the franchise itself, or make it so difficult as to amount to a denial." 322 A.3d at 905 (citation omitted). In rejecting this argument, the Court did not apply a strict scrutiny analysis and was not persuaded that the constitution required it to ignore clear statutory ballot requirements. *Id.* at 907-09. In fact, the Court did not mention the "scrutiny" analysis at all, further underscoring my point that it does not apply to free and equal elections clause challenges.

Justice Wecht wrote separately in *Walsh* to emphasize that the "Election Code really means what it says" and that its plain statutory language cannot not be disregarded by the courts in order to count non-compliant votes. *Id.* at 913 (Wecht, J., concurring). Justice Wecht implored litigants to redirect their pleadings challenging voting requirements from the judiciary to the General Assembly and Governor, who are charged with drafting and approving the legal prerequisites to having a ballot count. *Id.* at 915. With respect to the free and equal elections clause, Justice Wecht explained:

> Within the bounds of constitutional protections, the legislature is free to impose technicalities, and the courts are bound to apply them. Although the Election Code will be interpreted "with unstinting fidelity to its terms," considerations under the [c]onstitution's [f]ree and [e]qual [e]lection [c]lause may moderate its enforcement in particular cases. Arguments advanced under federal

statutes, such as the Voting Rights Act, may also require additional considerations and analyses. *Neither the Pennsylvania Constitution nor federal law is implicated in this case.*

*Id.* at 920 (emphasis added).

Despite this recent and clear guidance from our Supreme Court, the Majority, as it must, gives short shrift to the *Walsh* decision and relegates its discussion to a footnote. (MO, slip op. at 35 n.37.) It simply ignores the fact that no "scrutiny" analysis is mentioned in *Walsh* and proceeds to apply it anyway. Moreover, although the Majority attempts to distinguish *Walsh* on the basis that it involved provisional ballots (and for other, unidentified reasons), the principle in *Walsh* controls perfectly well here, namely, that strict scrutiny in the traditional sense simply does not apply to free and equal elections clause challenges to neutral and nonburdensome ballot-casting rules.

### III. The Majority's holding invalidates the entirety of Act 77.

Although the Majority's invalidation of the application of Act 77's provisions triggers Act 77's nonseverability clause (Section 11 of Act 77), the Majority nevertheless exercises its "discretion" to ignore the nonseverability clause and, once again, changes by judicial fiat how that legislation is to operate. I disagreed with the exact same missteps taken by the Majority in *BPEP II*, and my analysis there applies equally well here. *See BPEP II*, slip op. at 51-55 (McCullough, J., dissenting). Act 77, and the whole mail voting scheme it created, is now defunct.

### IV. Conclusion.

This Court has rushed this decision on virtually no record and without any analysis from the trial court. The Majority's holding disrupts the rules applicable to the already-underway 2024 General Election and, in my view, directly

PAM - 11

contradicts the Supreme Court's admonition in *New PA Project* that these decisions ought to be made after that election has concluded and on a developed record. I detailed at length in my dissent in *BPEP II* why the Declaration Dating Provisions do not disenfranchise anyone, do not burden the right to vote, and are not subject to strict scrutiny. I also detailed why the Majority's holding in *BPEP II* invalidating the enforcement of the Declaration Dating Provisions results in the wholesale invalidation of Act 77 and mail voting with it. Given the undeniable consequences of the Majority's holding today, I bid county boards of elections and Pennsylvania voters the best of luck in trying to decipher what they are supposed to do now.

The Election Code's rules in this regard are clear. We should have left them that way.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Brian T. Baxter and Susan T. Kinniry | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | Trial Ct. No. 2024 No. 02481 |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of | : | |
| Pennsylvania | : | |
| | : | |
| Appeal of: Philadelphia County | : | |
| Board of Elections | : | No. 1305 C.D. 2024 |
| | | |
| Brian T. Baxter and Susan T. Kinniry | : | |
| | : | |
| v. | : | |
| | : | |
| Philadelphia Board of Elections, | : | |
| Republican National Committee, | : | |
| and Republican Party of Pennsylvania | : | |
| | : | |
| Appeal of: Republican National | : | |
| Committee and Republican Party | : | No. 1309 C.D. 2024 |
| of Pennsylvania | : | Submitted: October 15, 2024 |


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE ELLEN CEISLER, Judge
          HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

DISSENTING OPINION BY
JUDGE WOLF                                    FILED: October 30, 2024

The Majority Opinion will risk causing confusion on the eve of the 2024 General Election and, therefore, I must dissent.

This appeal concerns a special election that is over. At issue are 69 undated and incorrectly dated absentee and mail-in ballots cast in a special election held on September 17, 2024, in Philadelphia County. The Philadelphia County Board of Elections' counting (or not counting) of those ballots will not impact the outcome of that election. Notwithstanding, this Court has forged on to "decide a constitutional issue of first impression regarding whether the application of certain provisions of our Election Code,[1] held to be unambiguous and mandatory but found to be otherwise meaningless, violates the free and equal elections clause of our Constitution." *Baxter v. Phila. Bd. of Elections* (Pa. Cmwlth., Nos. 1305, 1307 C.D. 2024, filed _____), slip op. at 41-42 (Maj. Op. at ___). Because this Court's decision is ill-timed, proceeding on an unnecessarily expedited track, has the potential to confuse the electorate, and deprives the Pennsylvania Supreme Court of a <u>reasonable</u> opportunity to review, I am left with no choice but to dissent.

## I. Unnecessarily Expedited Track

The Majority Opinion states several times that its holding is limited to "the circumstances of these appeals." *See* Maj. Op. at 4, 41. Despite the disclaimer, the Majority, in no uncertain terms, concludes that <u>any</u> county board of elections' decision not to count undated or incorrectly dated mail-in and absentee ballots violates the free and equal elections clause of the Pennsylvania Constitution. *See* PA. CONST. art. I, § 5. This holding is not limited or "as applied." *See Clifton v. Allegheny Cnty.*, 969 A.2d 1197, 1222 (Pa. 2009) ("A statute is facially unconstitutional only where no set of circumstances exist under which the statute

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.

would be valid."). As of October 30, 2024, there is no set of circumstances in which a county board of elections' decision not to count undated or incorrected dated mail-in and absentee ballots will pass constitutional muster.

The expedited nature of this landmark decision caused the Majority to gloss over important procedural issues—some raised by the parties and some not. First and foremost, the Majority does not fully consider the threshold issue of whether this Court has appellate jurisdiction. Under Section 762 of the Judicial Code, this Court generally has exclusive appellate jurisdiction of election appeals from court of common pleas because they affect the "application, interpretation or enforcement of [a] . . . statute relating to elections." 42 Pa.C.S. § 762(a)(4)(i)(c); *see Dayhoff v. Weaver*, 808 A.2d 1002, 1004-06 (Pa. Cmwlth. 2002) (confirming that the Election Code does not alter this rule *in general*). The Majority states that general rule. *See* Maj. Op. at 20 n.22 (quoting *Dayhoff*).

But there is an exception that the Majority does not address. It is from the Judicial Code, not the Election Code. If a matter is "by [S]ection 722 [of the Judicial Code] . . . within the exclusive jurisdiction of the Supreme Court," this Court lacks appellate jurisdiction. 42 Pa.C.S. § 762(b). Section 722(7) of the Judicial Code gives our Supreme Court <u>exclusive</u> appellate jurisdiction over "[m]atters where the court of common pleas has held invalid as repugnant to . . . the Constitution of this Commonwealth, any . . . provision of . . . any statute of[] this Commonwealth." 42 Pa.C.S. § 722(7). In this case, the court of common pleas "determined that the refusal to count" certain mail-in ballots due to incorrect dating "violates the free and equal elections clause set forth in [A]rticle I, [S]ection 5 of the Pennsylvania Constitution." Maj. Op. at 3. This amounts to a holding of constitutional invalidity of a statute (specifically, the Election Code's dating

provision) that triggers exclusive Supreme Court review under Section 722(7) of the Judicial Code, and thus prohibits this Court's appellate jurisdiction. This could be true notwithstanding that the trial court did not expressly say it was declaring any part of the Election Code unconstitutional.[2]

Though the parties do not raise that jurisdictional question, we are obligated to ensure jurisdiction *sua sponte*. *See Commonwealth v. Blystone*, 119 A.3d 306, 311 (Pa. 2015); *see also Zimmerman v. Schmidt*, ___ A.3d ___ (Pa., No. 63 MAP 2024, filed Sept. 25, 2024) (per curiam order) (vacating this Court's decision for want of subject matter jurisdiction after this Court failed to consider the jurisdictional issue *sua sponte*). And although parties can waive jurisdictional defects and thus perfect appellate jurisdiction in any appellate court in our Unified Judicial System, we need not accept the waiver because we retain the authority to "otherwise order[]"—i.e., to transfer the matter to the court with proper appellate jurisdiction. 42 Pa.C.S. § 704 (waiver of jurisdictional objections); *see id.* § 5103(a) (transfer).

Thus, there is an open question about whether the Court should transfer this matter to the Supreme Court for it to exercise the exclusive appellate jurisdiction arguably committed to it in the Judicial Code.[3] The Majority does not address that

---

[2] The jurisdictional rule of Section 722(7) appears to apply regardless whether the underlying constitutional holding is facial or as applied. *See Commonwealth v. Torsilieri*, 316 A.3d 77, 97 (Pa. 2024) (describing earlier Supreme Court decision on direct appeal from common pleas court as an "as applied" matter (citing *Commonwealth v. Torsilieri*, 232 A.3d 567, 572 (Pa. 2020))). Debating whether the trial court found the dating provision itself unconstitutional, or only its application or enforcement unconstitutional, seems to be a distinction without a difference, at least for jurisdictional purposes.

[3] Indeed, this Court could have done so immediately, which would have given the Supreme Court more time to review—and if necessary, to correct—the trial court's decision here.

question.[4]  Because the constitutional issues dealt with by the trial court will have such an immediate and potentially significant impact on Pennsylvania elections, and the immediate November 5th election in particular, I believe this matter should be before the Pennsylvania Supreme Court without our opinion.

Second, the Majority identifies a distinct procedural issue that some Designated Appellants here have raised: the failure to name or join the other 66 purportedly indispensable county boards in the appeal filed in the trial court.  Maj. Op. at 17 (summarizing parties' arguments).  Although that issue could implicate the trial court's jurisdiction, the Majority discusses it only in a footnote, without significant analysis or citation to caselaw.  *See* Maj. Op. at 23 n.25.  In this Commonwealth's decentralized election system, where elections are managed individually in each of the 67 counties, local election officials look to this Court's decisions for guidance on legal requirements for counting and not counting votes.  It does not take a stretch of the imagination to anticipate that the Majority Opinion will have an effect on election officials throughout the Commonwealth, six days before the November 5th General Election.  Regardless of the merits of the indispensability issue, it deserves explanation the Majority does not give.

---

[4] In this case in particular, there are compelling reasons for us to exercise any discretion we have to transfer.  The trial court's decision now stands.  It has not been stayed, vacated, or otherwise disturbed.  It binds the Philadelphia County Board of Elections to count the ballots at issue here in contravention of the Election Code, on the basis that not counting them would violate the Pennsylvania Constitution.  As I explain further below, this Court's decision in this case will contribute to confusion affecting voter behavior across the Commonwealth, but for those same reasons, the trial court's decision already causes confusion in Philadelphia County.  That is a more-than-usually compelling reason for us to promptly transfer this matter to the Supreme Court, which arguably has exclusive jurisdiction anyway under Section 722(7) and is best suited as the Commonwealth's supervisory court to clear the existing confusion.  Of course, the Supreme Court, like this one, need not decide the merits right now.  It could stay or vacate the decision below, or restrict its prospective effects.  The point is that there is one court that is best situated—and arguably statutorily empowered—to do that, and it is not this Court.

## II. Confusion to the Electorate & Impediment to Further High Court Review

Procedural issues aside, the Majority Opinion will have significant real-world ramifications. As recently as this month, our Supreme Court denied an application for the exercise of King's Bench jurisdiction to answer the precise question raised in the instant appeals, stating it "will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election." *New PA Project Educ. Fund v. Schmidt* (Pa., No. 112 MM 2024, filed Oct. 5, 2024) (*New PA Project*); *see also Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."); *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

The Pennsylvania Supreme Court's *New PA Project* decision was issued 30 days before the November 5th General Election. We are now six days before said election. Despite the crystal-clear directive from our Supreme Court, this Court is now handing down a sweeping constitutional decision disposing of an issue of first impression to settle the counting of votes that will not impact the outcome of a past special election, but which will cause a significant sea change in the election processes effectuated by the county boards.

All this aside, I am most concerned with how this Court's decision may influence voter behavior. On October 23, 2024, the Supreme Court handed down a decision in *Genser v. Butler County Board of Elections*, ___ A.3d ___ (Pa., Nos. 26 & 27 WAP 2024, filed Oct. 23, 2024), making clear that certain errors which result

in mail-in and absentee ballots being voided may be addressed by provisional voting. Voters and election officials are bound by *Genser*. But now, this Court's last-minute decision calls into question voters' need to vote by provisional ballot if they suspect an issue with the date on their mail-in or absentee ballot. When word of the "*Baxter* decision" gets out, it may lead an elector or election official to believe that an undated or incorrectly dated ballot will be counted despite its defect, counseling away from appearing on election day to vote provisionally. And this may stand true. But this Court, an intermediate appellate court, will most likely not be the last to speak on the issue, and the timing of this intermediate appellate Court's decision puts the Pennsylvania Supreme Court in a near-impossible position. *See New PA Project*, slip op. at 5 (Brobson, J., concurring statement) ("This Court's disposition of the King's Bench applications in this matter [] should discourage all who look to the courts of the Commonwealth to change the rules in the middle of an ongoing election.").

One need not look any further than the facts of this case to see how this Court's decisions on vote counting influence voter behavior:

> Designated Appellee Kinniry additionally attested to the fact that she received an email from the County Board on August 27, 2024, informing her that her vote would not be counted if she did not take additional steps to fix her omission of the date. However, she did not attempt to fix her mail-in ballot because she read the news about this Court's decision in [*Black Political Empowerment Project v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed Aug. 30, 2024) (*en banc*), *vacated*, 322 A.3d 221 (Pa. 2024)], in which this Court held that it is unconstitutional for county boards of elections to reject mail ballots for noncompliance with the Election Code's dating provisions.

Maj. Op. at 6-7. The Majority Opinion will undoubtedly influence the behavior of voters and election officials across the Commonwealth and will do so in a timeframe that all but forecloses further appellate review from our High Court.

While I am cognizant that the issue here was presented to this Court via statutory appeal,[5] and not through a vehicle grounded in equity, *cf. New PA Project*, our Supreme Court's recent warnings and the *Purcell* principle remain applicable as the Majority announces a new procedure just days before an already hotly contested presidential election, absent any "powerful reason to do so." *Crookston*, 841 F.3d at 398.

For the reasons articulated above, this Court should have considered transferring the matter to the Pennsylvania Supreme Court under Section 722(7) of the Judicial Code, or at the very least should have refrained from deciding this case on the eve of the 2024 General Election, and on the heels of *Genser*.[6]

_____
MATTHEW S. WOLF, Judge

---

[5] Section 1407(a) of the Election Code, 25 P.S. § 3157(a).

[6] Practically speaking, *Genser* encourages voting by provisional ballot as a fail-safe mechanism. Our decision here may discourage use of that fail-safe mechanism if a voter believes his or her ballot was undated or incorrectly dated. *See* discussion *supra* at 6-7. Setting forth a new ballot-counting rule now, without further appellate review, is the precise change to election procedures the Supreme Court has cautioned litigants from seeking, and Courts from handing out. *See New PA Project* (Brobson, J., concurring statement).